William FRANZ, et al., Appellants,

v.

UNITED STATES of America, et al.

No. 81-2369.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 20, 1982.

Decided May 10, 1983.

Before TAMM, EDWARDS and BORK, Circuit Judges.

Addendum to the Opinion for the Court, in which Circuit Judge TAMM concurs, filed by Circuit Judge HARRY T. EDWARDS on June 20, 1983.

Separate Statement, concurring in part and dissenting in part, filed by Circuit Judge BORK on June 15, 1983.

HARRY T. EDWARDS, Circuit Judge: *

The opinion for the court in this case was issued on May 10, 1983, and reported at 707 F.2d 582. Now, more than a month after the original decision, a separate statement, concurring in part and dissenting in part [hereinafter referred to as "the Separate Statement"], has been filed. At this juncture, a full response to the arguments advanced therein would not be productive. However, to ensure that the opinion for the court is neither misunderstood nor misapplied, it is necessary to call attention to the most important of the misstatements and the most troubling of the suggestions contained in the Separate Statement.

* *Circuit Judge* TAMM concurs in this Addendum to the Opinion for the Court.

## I

The Separate Statement initially objects to consideration of the constitutional claims made by the appellants, on the ground that the case should have been remanded to allow the parties to present evidence concerning Congress' intent to "preempt" state domestic-relations law. This strained effort to avoid the difficult questions raised by the appeal cannot withstand critical scrutiny.

 The language and legislative history of the Organized Crime Control Act of 1970 ("the Act") make perfectly clear that the Attorney General has been vested with discretionary authority sufficiently expansive to empower him to ignore state-created entitlements to the extent that he has in this case. The Act affords the Attorney General broad authority "to provide for the security of Government witnesses" and their families in the Witness Protection Program. See 707 F.2d at 586 n. 6. Nothing in the statute purports to limit the discretion of the Attorney General in circumstances when provision for the protection of a Government witness and his family implicates the rights of a non-custodial parent. There is no doubt that, in establishing a program designed to protect witnesses against organized crime, Congress did not intend to "federalize" domestic-relations law. It seems equally plain, however, that Congress meant to authorize the Attorney General to act, on occasion, in a manner that might be at odds with visitation rights created by state law.

To suggest otherwise, as the Separate Statement seemingly does, is to be blind to the obvious. It is inconceivable that Congress did not anticipate that the implementation of the Witness Protection Program might adversely affect the rights of third parties (such as creditors and non-custodial parents). The Program always has contemplated a change of identity and a relocation of participants to protect against their dis-

covery. Inherent in any such scheme is the possibility that participants will be lost to third parties seeking to collect debts, enforce visitation rights, or the like. Despite these obvious problems, Section 502 of the Act unequivocally states that the Attorney General may include a potential witness and his family in the Program "whenever, *in his judgment,* testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy." (Emphasis added). Furthermore, under Section 502, participation in the Program may continue "*for as long as the Attorney General determines* the jeopardy to [the inductee's] life or person continues." (Emphasis added).

We need not look solely to the explicit language of the statute, or to the consistent practices of the Government officials who have implemented the Witness Protection Program,[1] in order to understand congressional intent. The legislative history makes evident that Congress meant to empower the Attorney General to act in whatever way he saw fit to alleviate what it regarded as the pressing problem of retaliation against persons who provided evidence against organized crime. In the form in which it was originally introduced, the portion of the Organized Crime Control Act dealing with the protection of witnesses was somewhat less explicit than the final version in granting discretionary authority to the Attorney General. The Justice Department, in its extensive comments on the original bill, "wholeheartedly support[ed] the theory behind" the proposed protection program, but suggested, *inter alia,* that the provision be clarified to ensure that the Attorney General was not fettered in any way in deciding how to act in particular cases.

> [W]e believe that there should be authorization of appropriations for the care and protection of such witnesses to be

---

1. *See* U.S. GAO, REPORT BY THE COMPTROLLER GENERAL OF THE UNITED STATES, CHANGES NEEDED IN WITNESS SECURITY PROGRAM, GAO/GGD–83–25, at 14, 18–27 (1983) (describing how, over the course of the 12 years in which the program has been in operation, relocation of witnesses and their households has frequently resulted in frustration of the rights of creditors and relatives of the inductees) [hereinafter cited as "GAO Report"].

used *in whatever manner is deemed most useful under the special circumstances of each case.* Such a provision would provide the *necessary flexibility* to adequately deal with this problem.

Department of Justice Comments on S. 30, *reprinted in* S.REP. No. 617, 91st Cong., 1st Sess. 112 (1969) (emphasis added). The pertinent provisions in the proposed statute were subsequently altered in accordance with the Justice Department's suggestions, whereupon the Department expressed its support for the bill. S.REP. No. 617, *supra*, at 60. The final Senate and House reports leave no doubt as to the outcome of the exchange; both reports stress the extent of the discretionary power the Attorney General was to enjoy:

> *Section 501.*—This section authorizes the Attorney General to provide security for potential witnesses and their families in organized crime proceedings. The proceedings themselves need not be criminal. . . . It is necessary only that legal proceedings be involved and that the underlying factual situation embrace organized criminal activity.
>
> *Section 502.*—This section gives the Attorney General *broad authority* to determine the particular facility to be afforded and the length of time the facilities should be available. *This authority extends* to providing for the health and welfare, and *to offering all needed facilities to witnesses, and to their families or members of a household.* Use of such facilities may continue so long as necessary for protection, and the grant of authority is sufficiently broad to allow for relocation. There is no requirement that anyone accept such an offer by the Attorney General.

*Id.* at 150 (emphasis added). (The corresponding discussion in the House Report is substantially identical, *see* H.R.REP. No. 1549, 91st Cong., 2d Sess. 48 (1970).)

Recent legislative initiatives seeking to modify the power of the Attorney General in implementing the Witness Protection Program also illuminate Congress' understanding of the extent of the discretionary authority enjoyed by the Attorney General under the statute as it now stands. In recent years, due to increasing concern over the inability of third parties to enforce judgments against Program participants, *see* GAO Report, *supra* note 1, at 14, 18–27, several bills have been introduced in Congress to address this issue. As noted in the GAO Report,

> [i]n general, each bill required the Attorney General to take affirmative actions to urge the relocated person to comply with the judgment and to determine whether the relocated person had made reasonable efforts to comply with the judgment. If the Attorney General determined that the relocated person did not make reasonable efforts to comply with the judgment, *he could, at his discretion, after weighing the danger to the person relocated, disclose the identity and location of that person* to the plaintiff attempting to enforce the judgment.

*Id.* at 30 (emphasis added). What is noteworthy about these legislative proposals—all of which have been designed to *limit the discretion* of the Attorney General—is that none would *mandate* the disclosure of the identity of a person in the Witness Protection Program when the rights of a non-custodial parent were at stake. Rather, even under the most sweeping of the bills, the Attorney General would still retain the discretion to withhold the identity and location of a Program participant "after weighing the danger to the person." This is clearly consistent with the discretion given to and exercised by the Attorney General under the present Program.[2]

2. The most comprehensive of these bills, H.R. 7039, 97th Cong., 2d Sess. (1982), clearly covers suits by third parties against Program participants seeking to enforce familial rights, *see id.* at § 101 (proposing enactment of 18 U.S.C. § 3521(e))—though, as indicated in the text, it would not *require* the Attorney General to disclose the identity of a participant who refused to comply with such a demand.

Equally telling, in terms of Congress' understanding of the power presently enjoyed by the Attorney General, is the *absence of any provision* for the safeguarding of third-party familial rights in a bill introduced earlier in 1982. One

In light of the foregoing, it is quite plain that the Attorney General always has had broad authority under the Organized Crime Control Act to adhere to the practices heretofore followed in the Witness Protection Program. This authority is supported by the clear language and legislative history of the Act. We conclude, therefore, that the Separate Statement's reliance on arguments focused on preemption doctrine is nothing more than a failing attempt to put a square peg in a round hole.[3]

## II

The objections advanced in the Separate Statement to the majority's substantive due process analysis merit only brief attention. The Separate Statement is ingenuous enough to admit that its dissatisfaction with the majority's interpretation of the doctrine derives more from distaste for substantive due process theory in general than from disagreement regarding whether the principles established by the Supreme Court are fairly applicable to the instant case.

However, a few comments contained in the Separate Statement should not be allowed to pass unchallenged.

First, the suggestion that "the majority has created a fundamental right or interest by predicting a tradition that will spring to life in the future" is plainly wrong. Relying on a demographic study by the U.S. Bureau of the Census, the majority observed that non-custodial familial relations are becoming ever more common in American society. It then reasoned that the absence of a strong tradition recognizing the sanctity of such relationships, which is readily explainable by the relative rarity of "broken families" in American society in the past, should not result in *denial* of constitutional protection for such relationships as they become increasingly prevalent, 707 F.2d at 601, any more than the non-existence of telephones or electronic eavesdropping devices at the time the Fourth Amendment was ratified should be invoked to deny constitutional protection today against

---

of the purposes of this bill, S. 2420, 97th Cong., 2d Sess. (1982), in the form in which it emerged from the Senate Judiciary Committee, was to increase the ability of third parties to enforce claims against persons accepted into the Program. *See* S.Rep. No. 532, 97th Cong., 2d Sess. 26 (1982), U.S.Code Cong. & Admin.News 1982, p. 2515. Such increased protection was confined, however, to "civil cause[s] of action, arising prior to [the inductees'] relocation, for damages resulting from bodily injury, property damage, or injury to business," *id.* at 5; despite the wide publicity that had been accorded the numerous instances in which acceptance of witnesses and their households into the Program had resulted in disruption of familial relations, nothing in the bill was designed to compel the Attorney General to take into account the potential for such disruption when deciding whom to admit (or when deciding whether to reveal the location or new identity of an admittee). [In October 1982, S. 2420 was enacted into law. Prior to its passage, however, the provisions pertaining to the Witness Protection Program were deleted, pending completion of a study by a Presidential Task Force and "broader examination of the operation of the current program." *See* 128 Cong.Rec. S13,063–64 (daily ed. Oct. 1, 1982) (statement of Sen. Heinz).]

In sum, all of the recent legislative initiatives in this area take for granted that the Attorney General currently has statutory authority to act in the fashion he has in this case.

Finally, it should be noted that, in the extensive congressional hearings held in 1978 and 1980 to evaluate the operation of the Witness Protection Program, in which the problems generated when admission of witnesses' households disrupted other familial relations were discussed at length, *see Hearings* cited at 707 F.2d at 587 nn. 8, 11, no one suggested that the Attorney General lacked statutory power to admit persons into the Program under such circumstances.

3. It is somewhat ironic to note that the theory of this case suggested by the Separate Statement is potentially much more drastic than anything envisioned by the majority. Because the Separate Statement urges a preemption analysis in all-or-nothing terms, a finding that Congress had not evinced a desire to "override" state law would render illegal the acceptance of *any* witness (and his or her household) into the Witness Protection Program when the effect thereof would be to disrupt non-custodial familial relations. Alternatively, a finding that Congress *did* intend to "preempt" state law would require us to consider once again the question of Congress' constitutional power to do so. In short, the solution proffered by the Separate Statement would either impose a drastic set of constraints on the Marshals Service or would simply postpone consideration of the difficult constitutional questions that lie at the core of this case.

warrantless "wiretapping" by the police, *cf.* *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). In short, neither the absence of a strong tradition of respect nor a "prophecy" of the development of such a tradition was relied upon in the majority opinion to *"create"* a constitutional right; rather, the absence of the tradition, linked as it is to a social structure different from the present, was not allowed to *defeat* the right.

Second, it is difficult to take seriously the suggestion in the Separate Statement that severance of the bond between a minor child and his or her parent is constitutionally indistinguishable (under the terms of the majority's analysis) from severance of the bond between an adult draftee and his (or her) parent. When children grow up, their dependence on their parents for guidance, socialization, and support gradually diminishes. At the same time, the strength and importance of the emotional bonds between them and their parents usually decrease. Concededly, the bond between a parent and child when the child is an adult usually bears some resemblance to the same bond when the child was a minor. But, as a long line of Supreme Court cases attests, *see* 707 F.2d at 595 & nn. 53–57, the differences between the two stages of the relationship are sufficiently marked to warrant sharply different constitutional treatment.

Finally, the claim made in the Separate Statement that the result of our decision will be to "federalize[ ]" the "entire body of state domestic relations law" surely is a false alarm. Supreme Court decisions have long established that, when regulating the relations between parents and children, states must abide by certain minimal constitutional requirements—both substantive and procedural. *See Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978) (dicta); *Smith v. Organization of Foster Families,* 431 U.S. 816, 842, 97 S.Ct.

2094, 2108, 53 L.Ed.2d 14 (1977) (dicta); *Stanley v. Illinois,* 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (dicta); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). The opinion for the court in this case, limited as it is to situations in which government officials permanently sever "all ties between a non-custodial parent and his children without their participation or consent," 707 F.2d at 602, will not significantly tighten the constraints within which the states must operate.[4]

### III

The Separate Statement, finally, takes issue with the brief discussion in the concluding section of the majority opinion regarding the relevance of procedural due process doctrine to this case. With a bit of hyperbole, the Separate Statement suggests that the majority opinion is "wholly inadequate to meet the majority's own concerns, much less to deal with other serious problems."

The bulk of the comments made in the Separate Statement are founded on one or more of three serious misinterpretations of the majority opinion. First, the Separate Statement presumes that the opinion for the court "prescribes" a set of procedures for future use in situations resembling this case. The opinion for the court does nothing of the kind. It holds simply that the appellants have not been accorded the procedural protections required by the Constitution and then goes on to identify "some of the major considerations that must be taken into account when designing a system for dealing with cases of this sort." 707 F.2d at 608. The majority opinion disavows any intent (as the Separate Statement puts it) to "take the lead in devising the necessary procedures." The proposals made in

---

4. The suggestion that a requirement that government demonstrate a good reason before severing the bond between a child and his non-

custodial parent will "undermine the institution of the intact marriage" is sufficiently ludicrous as to merit no rebuttal.

the majority opinion are deliberately styled "suggestions" to "a body with greater knowledge than we possess of the ways in which the Witness Protection Program does or might operate." 707 F.2d at 608. To characterize the majority's analysis as the formulation of a rigid set of procedures, with which the Marshals Service henceforth must comply, is wholly without justification.

Second, the Separate Statement conveniently ignores one of the suggestions that the opinion for the court does make. The majority ventures a guess that an "informal" procedure would be likely to work best in this peculiar context. 707 F.2d at 609. To read the Separate Statement, one would think that the majority opinion mandates a full-blown judicial proceeding. The Separate Statement expends considerable effort in demonstrating that such a procedure would likely be both unworkable and unhelpful—effort that, insofar as it is designed to topple a portion of the opinion for the court, is entirely wasted.

Finally, the suggestion in the Separate Statement that the opinion for the court would require proof, in each instance, that "the testimony of [the] informant is *essential* to the prosecution of an important leader of organized crime and that the interests of [the] noncustodial parent and members of the informant's household cannot be accommodated without risking human life" is folderol. The quoted language is taken from the section of the majority opinion that discusses (without resolving the question) whether, in a situation in which the Marshals Service could not arrange secret meetings and in which induction of a witness and his household would entail, consequently, permanent severance of the bond between a non-custodial parent and his offspring, the strongest governmental objective imaginable would be sufficient to justify abrogation of the parent's and children's rights. 707 F.2d at 607. Never is it suggested that, in every case in which a witness and his household were accepted into the program, the government would in the future be required to demonstrate the existence of the conditions described above.

The opinion for the court ventures no ruling on the issue of what precisely would have to be proved in each case. The refusal to do so was deliberate; as the majority pointed out (and as the Separate Statement appears to agree), we simply lack sufficient evidence at this juncture to make judgments of this sort.

In many respects, the discussion in the last section of the Separate Statement is highly unfortunate. Some of the comments in the Separate Statement, regarding the practicability of various procedural options, are both insightful and perfectly consistent with views espoused in the majority opinion. Sadly, however, these comments are often obscured by overstatements and misstatements. For example, the Separate Statement confidently asserts that non-custodial parents whose former spouses become affiliated with members of organized crime are more likely than average non-custodial parents to be themselves affiliated with organized crime. There is no reason for making such an assumption, and the Separate Statement certainly offers none.

Similarly, when the Separate Statement finds inconvenient the assertions by the Marshals Service that it is capable of arranging secret meetings between children in the Program and their non-custodial parents, it simply refuses to accept them. This cavalier repudiation of statements made by (a) the defendants in their brief, (b) the defendants' counsel at oral argument, and (c) the Director of the Marshals Service and the Chief of the Witness Security Division in hearings before a Senate Subcommittee, insisting not only that they are capable of arranging such meetings but that they have done so in the past, *see* 707 F.2d at 590 & n. 28 (and *Hearings* cited therein), makes it extremely difficult to engage in a legitimate discussion of the issues.

CONCLUSION

The Separate Statement is no doubt correct in observing that the factual basis of this case has not been fully developed. A host of questions will have to be explored

before the case is concluded. At this point, however, we are obliged only to decide the issues presented on this appeal. The District Court, 526 F.Supp. 126, dismissed the suit for failure to state a claim on which relief can be granted. We have been asked whether, on the facts as alleged in the complaint, that ruling was correct. Neither impatience with the "legal and factual mess" out of which the dispute arises nor uneasiness at the prospect of dealing with the ungainly constitutional doctrines implicated by the case relieves us of our duty to answer the question presented. For the reasons stated in the opinion for the court, we have *enough* information to determine whether the appellants have stated a claim, and we conclude that they have.

BORK, Circuit Judge, concurring in part and dissenting in part:

I agree that the judgment must be reversed. The complaint states a claim for relief and should not have been dismissed. I can, however, agree to very little else in the majority opinion. The majority has passed by the threshold legal issue in this case in order to create a new constitutional right and invent a new procedure to protect it. The result is not a happy one. The right is dubiously grounded and the procedure protects very little. In my view of this case, we are a long way from having to deal with the issues the majority reaches for.

### I.

The Organized Crime Control Act of 1970 created the Witness Protection Program. Under the program, the testimony of witnesses against participants in organized crime is obtained by the promise of relocation to protect witnesses and their families from reprisal. Complete secrecy concerning the whereabouts and new identities of the relocated persons is essential. So far as appears, neither Congress nor the Executive foresaw or grappled with the problems created when relocation sunders family ties and breaches rights created by state law. Such cases have begun to surface. This

may be one. William Franz, who brings this action on behalf of his children and himself, married Catherine Mary Franz. The couple had three children but later separated and, still later, divorced. Catherine, who had custody of the children, began to live with, and may have married, Charles Allen. Allen, apparently a contract killer for organized crime figures, agreed to testify in a federal criminal trial if he, Catherine, and the three children were admitted to the Witness Protection Program. The government met Allen's condition, and William Franz has been unable to find his children since. Through this litigation, he seeks to vindicate the right to visit them.

The legal and factual background against which this action must be judged is less than clear. This case has gone forward on the assumption that in February, 1974, after the separation but before the divorce, a Pennsylvania court gave William visitation rights with respect to the children and gave Catherine custody, if she did not already have it. It is suggested in this court, however, that William may not have been awarded visitation rights, and no record of a visitation order has been found. We do not know whether, if there was no visitation order, William would nevertheless have visitation rights under Pennsylvania law, assuming that law to be controlling. We do not know what defenses Pennsylvania law provides Catherine in an action brought by William to enforce his visitation rights. Nor do we know whether persons (such as the defendants here) violate state law when they assist the custodial parent in defeating the visitation rights of the other parent. *See generally* Novinson, *Post-Divorce Visitation: Untying the Triangular Knot,* 1983 U.Ill.L.Rev. 121; Campbell, *The Tort of Custodial Interference—Toward a More Complete Remedy to Parental Kidnappings,* 1983 U.Ill.L.Rev. 229, 247–56. In fact, given the absence of any decree, we are not even certain that Catherine had legal custody of the children. Moreover, the legislative history of the Witness Protection Program has been so little explored that we do not know whether Congress ever considered the problem of state rights of visitation,

and we most certainly have no inkling what impact giving effect to such rights would have on the federal interest in the successful operation of the program. If I am right that answers to these questions are crucial, the short of the matter is that we know almost nothing that we need to know to decide the merits of this case. The case should be remanded so that the district court can determine the answers and proceed accordingly.

## II.

Assuming that William Franz and his children have a right under state law to see one another, there is no doubt that that right has been destroyed by Catherine Franz with the assistance of officers of the United States purporting to act under the authority of a statute of the United States. If Pennsylvania law recognizes a tort of interference with visitation rights, or provides some other remedy to William, the question in this case is then simply whether the Organized Crime Control Act shields the United States and the defendant officers of the United States from liability. As the record now stands, I think the Act probably does not. But I stress that further development of the legislative history and of the effect enforcing visitation rights would have upon the Witness Protection Program might change my mind.

Congress, in creating the Witness Protection Program, apparently did not consider whether the federal interest in combatting organized crime required it to displace the interest of the states in regulating family relations. We have been shown no direct evidence of any congressional intent to oust state laws in the area. This is not an end to the matter, however, for it is well-established that federal legislation may oust state law where evidence of such an intent, real or presumed, may be garnered indirectly—from, for example, the pervasiveness of the scheme of federal regulations, the dominance of the federal interest, or the inconsistency of state law with the federal law. *See generally* Note, *The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court,* 75 Colum.L.Rev. 623 (1975).

It is relevant to this determination that the state laws here in question regulate family relations, a subject that lies at the core of the police powers of the states. As the Supreme Court observed in *Sosna v. Iowa,* 419 U.S. 393, 404, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975), the field of domestic relations "has long been regarded as a virtually exclusive province of the States." Congress has evidenced a similar understanding of the allocation of powers between the nation and the states by generally avoiding direct interference with state regulation of family relationships. So strong has this tradition been that it was long simply a given that federal power could not touch this area of life. Thus, Justice Holmes regarded this as axiomatic in an argument concerning the reach of the commerce clause: "Commerce depends upon population, but Congress could not, on that ground, undertake to regulate marriage and divorce." *Northern Securities Co. v. United States,* 193 U.S. 197, 402, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904) (Holmes, J., dissenting).

Today, the commerce power attaches to effects on commerce that are no more direct or substantial than those in Holmes' hypothetical; yet it remains true that family law continues to be regarded as almost entirely a state matter. Whatever current constitutional limits to federal power may be, it is absolutely clear that federal preemption in areas of family law must, at the very least, meet stringent standards to succeed. In *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979), the Supreme Court stated:

Insofar as marriage is within temporal control, the States lay on the guiding hand. "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *In re Burrus,* 136 U.S. 586, 593–594 [10 S.Ct. 850, 852–853, 34 L.Ed. 1500] (1890). Federal courts repeatedly have declined to assert jurisdiction over di-

vorces that presented no federal question. See, *e.g., Ohio ex rel. Popovici v. Agler,* 280 U.S. 379 [50 S.Ct. 154, 74 L.Ed. 489] (1930). On the rare occasion when state family law has come into conflict with a federal statute, this Court has limited review under the Supremacy Clause to a determination whether Congress has "positively required by direct enactment" that state law be pre-empted. *Wetmore v. Markoe,* 196 U.S. 68, 77 [25 S.Ct. 172, 176, 49 L.Ed. 390] (1904). A mere conflict in words is not sufficient. State family and family-property law must do "major damage" to "clear and substantial" federal interests before the Supremacy Clause will demand that state law be overridden. *United States v. Yazell,* 382 U.S. 341, 352, 86 S.Ct. 500, 506, 15 L.Ed.2d 404 (1966).

The majority opinion brushes these constitutional concerns aside with the remark, "Assuming, *arguendo,* that the Attorney General needed such authority to effect the kind of incidental, *de facto* displacement of state law at issue here, he possessed it." Maj. op., 707 F.2d at 586 n. 5. The authority cited for this is section 501 of the federal statute. Pub.L. No. 91–452, § 501, 84 Stat. 922, 933 (1970) (codified at 18 U.S.C. *prec.* § 3481 (1976)). It will not do to shrug off the most fundamental precepts of federalism so casually. The displacement of state law may be incidental to a federal program, but that does not enhance an inference of preemption; indeed, it weakens the inference that it was Congress' purpose to preempt state laws. *See Hines v. Davidowitz,* 312 U.S. 52, 70, 61 S.Ct. 399, 406, 85 L.Ed. 581 (1941); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Preemption is more likely to be inferred where the displacement of state law is of central rather than peripheral importance. Nor is it clear why the nullification of law is *de facto* rather than *de jure,* much less why such a characterization makes the nullification constitutionally less suspect. The truth is that a federal officer needs authority to set at naught the legal commands of a state government, and no such authority is explicit in section 501. That provision states:

SEC. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.

That is authority to run the program to protect witnesses. It cannot be taken as the authority to override state family law that *Hisquierdo* requires. The statute probably does not even create a "mere conflict in words." Most certainly section 501's text does not justify a conclusion that "Congress has 'positively required by direct enactment' that state law be preempted." It is possible that state visitation rights would "do 'major damage' to 'clear and substantial' federal interests," but the government has not urged that in this court and we have no way of knowing. If preemption is to be found, the government should give us the factual basis upon which to rest such a conclusion.

It appears, so far as we are informed, that Congress has not addressed the extent to which, if at all, it wishes to oust state domestic relations law for the greater efficiency of the Witness Protection Program, or considered what accommodations might be possible between the interests thus brought into conflict. Under these circumstances, we should not infer an intent to preempt that may be entirely fictitious.

The district court relied upon *Leonhard v. United States,* 633 F.2d 599 (2d Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981), in dismissing William Franz's complaint. Though the father there was in a position like William's here (seeking to vindicate both his own and his children's rights) and had state court decrees awarding visitation and then custody, he relied solely, and unsuccessfully, on the due process clause of the fifth amendment. My analysis at this stage of the case rests entirely upon a tentative conclusion that rights assumed to have been given by state law have not been extinguished by Congress. That issue was not present in *Leon-*

*hard* and that decision does not, therefore, justify dismissing the complaint here.

The correct resolution of the issues here is to remand the case for a determination of the state legal rights involved. The district court should determine whether William Franz has a state law right to visit his children, whether state law provides a remedy against third parties (here federal officers) who assist in the frustration of that right, whether there are defenses available to those who oppose visitation, defenses such as, perhaps, the safety of the children or the safety of their mother and stepfather. Doubtless, other issues may be presented for legal and factual determination. For example, plaintiffs pleaded a claim under the Administrative Procedure Act, 5 U.S.C. § 706 (1976), which has not been addressed. Because this appeal has somewhat refocussed the issues, had my view prevailed the government would also have been given the opportunity to establish preemption.

It would be premature to specify the details of possible remedies until we know more of the legal and factual terrain on which any remedy must operate. This is particularly true in light of the difficulties and complications discussed in Section III of this opinion.

It would be inappropriate to speculate now about the constitutionality of the nullification of state visitation law should further evidence require a finding of attempted preemption by the Witness Protection Program or, assuming an attempt to preempt is not inferred, if some presently unpredictable congressional response occurs. Should Congress desire to override some aspects of state domestic relations law in the interests of the program, it will be time enough to decide if there are limits to federal power in this area.

### III.

Because the majority opinion takes an altogether different tack from mine and creates new law, it is necessary that I state the reasons why I do not join my colleagues. These reasons have to do with my brethren's unduly expansive discussion of state action, their suggestion that a congressional factual determination may be wrong, the infirmities of their substantive due process analysis, and the difficulties, amounting to impossibilities, with the procedures they find necessary to protect the right they create.

### A.

In the view I take of this case, there is no need to ask whether "state action" exists. The majority, because it assumes that the Witness Protection Program makes irrelevant William's rights under state law, must find action by the United States before it can proceed to construct a constitutional right. That there is state action here seems indisputable. Officers of the United States, acting under color of federal law, have removed William's children from their prior residence to a place where William cannot find them, have provided Catherine with the means to keep the children's whereabouts secret, and continue to frustrate William's efforts to locate his children. All this is done in furtherance of a federal program, since, if William could find his children, the protected witness might be less safe and potential witnesses in the future might be unwilling to testify because of the diminished protection the program affords. William's injury, therefore, flows directly from deliberate governmental decisions and actions that inflict the injury for governmental purposes. There seems no question in these circumstances that the complained of injury can be "fairly attributable to the state." *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). *Compare Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

So plain is that conclusion that there is no need for the proliferation of theories of state action, some with no definable limits to them, in the majority opinion. These theories are unnecessary to decide this case and some of them appear to have worrisome ramifications. I regret that the majority has gone out of its way to endorse

them because the expansion of amorphous state action theories results in constitutionalizing more and more aspects of life, thereby increasingly substituting rule by judges for rule by other institutions and by private individuals.

### B.

It is not to be doubted by an inferior court that substantive due process is part of our constitutional law. The Supreme Court has made it so, and that must be enough for us. Though the doctrine fell into general disrepute after decisions such as *Allgeyer v. Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. (1897), and *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), it was revived by the Court, with a decidedly different content, in decisions such as *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The majority is quite correct in saying that the Court has fashioned both a substantive and procedural constitutional law of family relations in cases such as *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). *See also* Hafen, *The Constitutional Status of Marriage, Kinship, and Sexual Privacy—Balancing the Individual and Social Interests*, 81 Mich.L. Rev. 463 (1983).

To recognize this is one thing; to go further than the Supreme Court ever has and create for a non-custodial parent a new substantive right to visit his or her children is quite another. The majority emphasizes that the infringement alleged is not merely a curtailment or disruption of the parent-child relation but its permanent termination. The constitutional right is to continue visits in order to avoid that termination. I cannot agree that the Constitution of its own force establishes any such right for a non-custodial parent.

It is always somewhat difficult to criticize substantive due process decisions with any degree of rigor precisely because they proceed, necessarily, by rather amorphous generalizations concerning such matters as tradition, the desirability of cultural heterogeneity, and the like. There is much discussion of that sort in the majority opinion here. I do not disagree with many of the general sentiments expressed, but that does not mean those sentiments add up to a constitutional right.

As ill-defined as the mode of reasoning appropriate to substantive due process is, there are, or ought to be, limits to what a court can accomplish with that type of argument. Since the Constitution itself provides neither textual nor structural guidance to judges embarked upon this chartless sea, it behooves us to be cautious rather than venturesome. I think the majority is unduly bold in what it does here. The Supreme Court has established procedural constitutional protections for various relationships within the family. The Court has never enunciated a substantive right to so tenuous a relationship as visitation by a non-custodial parent. The reason for protecting the family and the institution of marriage is not merely that they are fundamental to our society but that our entire tradition is to encourage, support, and respect them. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 232–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972), and *Bellotti v. Baird*, 443 U.S. 622, 638–39, 99 S.Ct. 3035, 3045–46, 61 L.Ed.2d 797 (1979) (plurality opinion). *See generally* Hafen, *supra*, 81 Mich.L.Rev. 463. That cannot be said of broken homes and dissolved marriages. In fact, to throw substantive and not simply procedural constitutional protections around dissolved families will likely have a tendency further to undermine the institution of the intact marriage and may thus partially contradict the rationale for what the Supreme Court has been doing in this area.

Indeed, the majority takes the usual argument for creating fundamental rights and runs it backwards. Fundamental rights are usually grounded in the existence of a tradition of respect for the cultural institution in question. The majority notes that there is no comparable tradition of respect for the bond between a child and his non-custodial parent. Maj. op. at 600. That would seem a considerable difficulty

for fundamental rights analysis. But the majority turns the difficulty to advantage by prophesying a continuing trend toward divorce and hence the increased social importance of the "broken" family. This, the majority declares, is sufficient to permit ignoring the absence of a strong tradition with respect to non-custodial parents. In effect, the majority has created a fundamental right or interest by predicting a tradition that will spring to life in the future. Courts have enough trouble identifying and deriving specific meaning from traditions that are real and have been with us for centuries past without imagining traditions that have yet to exist.

The argument of the majority opinion also rests heavily upon the importance of the emotional bond between the non-custodial parent and the child. No doubt there is usually such a bond and the termination of the relation between the parent and the child will cause considerable distress. It would be well, however, if there were some additional analysis indicating how this form of emotional distress differs from others that the majority does not, I assume, wish to make the foundation for additional fundamental rights. Suppose, for example, that a mother brought suit protesting her son's induction into a dangerous branch of the armed services. In such a case, there would be at least a temporary and quite possibly a permanent severance of the relation. Moreover, there would be in that case, as there is not in this, a strong tradition of respect for the relationship. And, since the majority mentions the promotion of cultural heterogeneity as a factor to be promoted, it may be noted that the armed services tend to foster cultural homogeneity. Though the majority emphasizes the narrowness of its reasoning, see, e.g., maj. op. at 602, it does so merely by assertion; it does not identify any limiting principles that would prevent its reasoning from being applied to situations like the one just described. The majority's reasoning, in short, lacks rigor and, on its own terms, could produce quite surprising results.

The decisive argument against judicial creation of a substantive constitutional right of a non-custodial parent to visit his or her children is that it is likely to make many state law denials of a right of visitation, or of custody, subject to federal constitutional challenge—a challenge based not upon the need for adequate procedures but upon some federal substantive standard. The majority states that its principle is limited to cases of *permanent* severance of the relation between parent and child, but it is doubtful that the underlying rationale permits the principle so to be confined. The rationale is the protection of the emotional bond between parent and child. A temporary severance of significant length is likely in many cases to destroy the emotional bond. Thus, on the majority's rationale, a denial of visitation rights or of custodial rights, if it lasted a significant period of time, should fall within their principle of constitutional protection. Once this substantive right is in place, a state will have to muster a "compelling need" whenever it wishes significantly to deny visitation rights or custody to one parent. The major component of the necessary showing would be, one assumes, the "best interests of the child." Such determinations would be subject to constitutional challenges in federal courts and so we would come to have a constitutional law of what constitutes the best interests of the child. This entire body of state domestic relations law would be federalized. It would be difficult to imagine a subject less appropriate for constitutional law and the federal judiciary.

### C.

Also troubling is the majority's willingness to enter upon the topic of the propensity of organized crime leaders to eliminate potential witnesses and to retaliate against those who have already testified. Although the majority states that it declines to speculate because of the paucity of relevant evidence in the record and the inconclusiveness of data available from other sources, it does conclude that the matter is in sufficient doubt that "the assessment of the relative strength of the government's interest and the parent's and children's rights will be a

difficult task for the body that must ultimately undertake it." Maj. op. at 606. This clearly indicates that some undefined "body" may decide that the evidence of organized crime's propensity to kill potential and actual witnesses is too weak to justify ending the newly constitutionalized visitation rights of a non-custodial parent. If that "body" is Congress, I have no problem with the suggestion. But, since the observation is made in connection with a discussion of the compelling interest that must be shown to overcome a "fundamental liberty interest," it appears that the majority is suggesting that a court or some other arbiter may decide that Congress has insufficient evidence about organized crime to make the choice. If so, the suggestion is extraordinary. Congress has already decided that persons engaged in organized crime kill witnesses. That is an entirely reasonable judgment and it is conclusive upon us and upon any other tribunal that may become involved in this area.

### D.

The majority's reasoning is weakest when it prescribes a hearing "to work out some accommodation of the rights of the children and the parent left behind." Maj. op. at 609. Initially, I wish to show that this "hearing" cannot accomplish the results the majority intends and is wholly inadequate to the grave issues the majority says must be reconciled. But I do not rest upon that point, since it would be possible to devise a better hearing, though that, too, would face difficulties so grave that an appellate court, working with a record as devoid of information as the one we have here, ought not to take the lead in devising the necessary procedures. That task should, at least in the first instance, be undertaken by Congress or the Executive. With the record made, the problems and possible solutions explicated, judicial review could apply constitutional

values to a real rather than a hypothetical set of procedures.

The hearing the majority has devised is to be held within the three-day period between a decision to admit an informant to the Witness Protection Program and the execution of that decision by the Marshals Service. It is to be secret, because secrecy is essential to the safety of everyone involved. It is to be informal and is to stress "negotiation and accommodation" between the custodial and non-custodial parents as well, one assumes, as among these and the informant, whose life is at stake, and the children. It is also to determine whether, in the particular case, the government has shown that its compelling interest outweighs the constitutional right of the non-custodial parent to visitations with the children. We are told that the government is to make a particularized showing of advantage in the specific case, maj. op. at 606, which seems to mean a showing that "the testimony of an informant is *essential* to the prosecution of an important leader of organized crime and that the interests of a non-custodial parent and members of the informant's household cannot be accommodated without risking human life." Maj. op. at 605 (emphasis in original).[1] This means the government will have to lay out its case against the organized crime leader and show both the figure's importance and the necessity of the informant's testimony. It will also have to show the absence of any effective alternative that is less restrictive of visitation rights. The majority concedes that judicial review of the decision made will be virtually impossible. In short, the hearing is to be hasty, secret, informal, and unreviewable, but nonetheless charged with the determination of what the majority conceives to be the most fundamental human rights. It does not sound promising.

Some problems are created because the majority has confined its prescribed hearing

---

1. It should be noted that the majority has, without explanation, imposed three major additional limits on a statute that itself requires only that the person be a witness or potential witness in "legal proceedings against any person alleged to have participated in an organized criminal activity." The statute does not require that the witness' testimony be "essential," that the legal proceeding be a "criminal prosecution," or that the proceeding be against an "important leader" of organized crime.

to the three-day period between the decision to admit the witness to the program and the execution of that decision by the Marshals Service. This hearing apparently will consist of two proceedings that, because of the time constraint, will often have to go forward simultaneously. One will be the attempt to negotiate a compromise secure enough to guarantee the relocating family's safety and open enough to allow the non-relocating parent a good chance of maintaining his bonds with his children. As I will discuss below, the relocating family is likely to think, with some justification, that any visitation rights, certainly any rights to visit frequently enough to sustain the emotional bond that the majority seeks to protect, will be unacceptably dangerous. The non-custodial parent, on the other hand, is likely to insist on the maximum amount of visitation, or at least the amount he could get, or has already gotten, from a divorce court. Nor is that parent likely to agree to fly to a series of changing locations around the country in order to enhance security. If the emotional bond is the crux of the matter, he will want the children brought to his home so that the visit can take place in an atmosphere conducive to the maintenance of that bond. Aside from the objective differences in the parties' real interests, it must be remembered that the separated parents are unlikely to be friends eager to accommodate one another and that the subject matter of this meeting will be emotionally highly divisive. If that were not enough to preclude compromise, the non-custodial parent will simultaneously be engaged in an adversarial proceeding with the government, a proceeding in which the relocating family will be ranged on the government's side. The prospects for agreement would be dim at best, but they are made worse by the setting and the time constraints on the proceedings.

Some of this could be cured. There is no reason to accept as unalterable the present administrative practices of the Marshals Service. If the hearing were placed in an absolutely secure setting, such as a military base, the non-custodial parent could be given adequate notice and the hearing itself could take as long as required. But even then the hearing would be unlikely to produce the conciliation that the majority hopes will make the problem go away. Moreover, though the difficulties of the adversarial process would be mitigated by advance notice and a lengthier hearing, they would remain substantial and perhaps fatal to the purposes the majority hopes to serve. Supposedly, the non-custodial parent is to be given the opportunity to challenge the government's showing that some third person not present is a leader of organized crime and that he can be convicted only if the informant testifies. The government can hardly be expected to make public its case against the leader of organized crime in advance of his prosecution and to explain what the witness will testify to and why a conviction is impossible without that testimony. Every hearing of the sort mandated would impose a significant risk that all of that information would become public.

On the other side, the non-custodial parent, even assisted by able counsel, would have an enormously difficult task in meeting the government's case. Presumably, he will have no way of showing that the absent person is not a leader of organized crime. He will have no way of rebutting a showing that the witness' testimony is essential. To do these things, the non-custodial parent would have to engage in extensive prehearing discovery into the workings of organized crime and would have to be able to summon his own witnesses and cross-examine the government's witnesses. These are rights he can hardly be accorded and would not have the resources to pursue in any event. The non-custodial parent is placed in a position of having to conduct a defense of the absent person the government wishes to prosecute to show his unimportance as well as a prosecution to show the witness is unnecessary. This is all highly unrealistic. The government's showing of a compelling interest will usually go virtually uncontested. That will be true regardless of the amount of notice given or the length of the hearing. Without the right to discovery, without the right to

summon witnesses, without the right to effective cross-examination, without anything we believe the ordinary litigant absolutely requires, the non-custodial parent, even with the ablest counsel, will usually be helpless. His only contribution will be to lend legitimacy to the process by his presence.

There are many things we are not told about the hearing the majority requires—the official, if any, who is to preside, the need for counsel, the standard of proof the government must meet, the level of inquiry into the non-custodial parent's fitness and trustworthiness, and the rules of procedure that will govern. The one thing we may be sure of is that the hearing will not be adequate to make a fair and accurate assessment of the issues the majority would entrust to it.

The problem is greater than this, however. It may be that the issues necessarily involved in the situation we are confronting simply do not lend themselves to judicialization or to a solution that satisfactorily balances the interests necessarily in conflict. I will try to suggest the problems that may lead to that conclusion, though I do so very tentatively because I know much too little to make any confident statements about this subject.

The focus of any hearing, as the majority notes, must be whether the non-custodial parent's visitation rights are to be terminated or given effect through meetings arranged by the Marshals Service. The primary issue will be the safety with which such meetings can be arranged. Counsel for the government has stated to us that the Marshals Service can arrange such meetings safely. I am unwilling to give dispositive weight to that concession without greater consideration of the practicalities than is possible on the record before us. For one thing, I am not sure that, with respect to people already in the program, we should accept the statement of the Marshals Service as conclusive if the people whose lives are at stake disagree. We do not know why Catherine has refused to allow visits to be arranged. Beyond that, and taking into account other cases as well

as this one, there seems to me good reason to be skeptical about the Service's statement that it can conduct adequate visitations safely.

It is reasonable to believe that leaders of organized crime will be assiduous in their efforts to find witnesses hidden by the Witness Protection Program. Aside from ordinary motives of vengeance, leaders of organized crime surely have a strong and continuing "business incentive" to kill former witnesses or members of their families even years after the testimony has been given. The success of such reprisals would demonstrate to potential future informers that the Witness Protection Program is not a safe harbor for turncoats.

Where safety from the vengeance of organized crime is the issue, as it must be if the federal interest is to be served, a central concern must be the character and trustworthiness of the non-custodial parent. The hearing officer must of course determine whether the non-custodial parent is motivated—perhaps because of vindictiveness or perhaps because he is assisting leaders of organized crime—by a desire to make the location of the informant known. That motivation is by no means impossible. One district court has found in a case like this that a parent's effort to find her children was a "vehicle of intended homicide." *Ruffalo v. Civiletti*, 565 F.Supp. 34 (W.D.Mo. 1983). Non-custodial parents whose estranged spouses take up with organized crime figures are more likely than a random sample of all non-custodial parents themselves to have some connection or acquaintance with organized crime. The hearing officer will often have grave difficulty in estimating the real motivations of non-custodial parents.

But the problems are grave even when the non-custodial parent's motives are entirely pure, as usually they will be. If the parent should learn or allow himself to learn the location of his former wife from the children, he may be subject to bribery, coercion, or other pressure from criminals bent on reprisal. He may inadvertently let slip that location or the fact that he knows

it. Making reliable judgments about a person's ability to avoid learning what he should not know and to maintain silence about what he knows is obviously an almost impossible task. If the arbiter, whoever he or she may be, makes a mistake about the character or motives of the non-custodial parent and grants visitation rights that should have been withheld, the results may well be the deaths of the relocated family members.

Problems of a different sort may be imagined. As noted, a non-custodial parent who is truly interested in maintaining an emotional bond to his children will require frequent visits and will want them at his home, not a hotel in some distant city or a room at some airport. Thus, to take a plausible hypothetical, the non-custodial father may seek and be granted weekly or monthly visits at his home. If these are to continue for, say, ten years, the cost will be enormous, though that is not my main point. Instead, what must be recognized is that 520 or 120 visits present an enormous security problem. The Marshals Service will have to make sure that the father does not learn the location of the relocated family, as he well might from small children, or, if he should learn the location that he, too, is guarded. The Service will also have to ensure that, despite the frequency and hence predictability of the visits, the children are safe from kidnapping.

It may be that I have exaggerated the dangers in the situation; it may also be that I have underestimated them. The point is that I do not know, and that no judge on this court knows. We have at present no basis for making any judgment. I set out my doubts about the hearing prescribed by the majority and their reliance upon counsel's assertion that visits can be safely arranged simply because we are deciding matters of enormous difficulty in the abstract, without full knowledge of what the problems are or what the government's range of solutions might be. Instead of plunging ahead to devise a procedure that has little chance of being useful, we ought to insist that those with the capacity to gather the relevant information and to provide the resources for a solution address the problem and do so expeditiously.

## IV.

This case presents issues of human rights but it does so against a background that is, to put it bluntly, a legal and factual mess. The one thing I am sure of is that the majority has reached issues that are not ripe for resolution and prescribed a remedy that is wholly inadequate to the gravity of the majority's concerns and that may prove a disaster for both the individuals involved and the Witness Protection Program. Had the case been decided on the grounds I urge, and had federal preemption of state domestic relations law not been shown, the situation would have been put squarely where it belongs, in Congress. Congress may well have overlooked the problem of state custody and visitation rights in establishing the Witness Protection Program. If so, Congress should decide whether it really wants to preempt state law in this area and whether it wants to provide procedures to balance the rights of non-custodial parents and the federal interest.

If preemption has occurred, so that state rights of visitation are nullified, and if the majority wishes to stand by its construction of a new constitutional right of visitation, the proper course would be to stop the program until either Congress or the Executive had worked out better procedures, ones more sensitive to the problem, than they have constructed or can construct in the abstract. Meanwhile, the district court should have been instructed to take evidence relating to the problems of a remedy and devised visitation rights for William Franz. If the new substantive constitutional right had not been constructed, William would still have had a liberty interest requiring due process, a right which, if he had no state or federal substantive right, would have been vindicated by a process designed to determine whether the Attorney General, through his delegate, had acted within the ambit of the authority granted by Congress.

Instead, the majority, in a footnote, off-handedly finds federal preemption of state domestic relations laws, and does so without heeding Supreme Court precedent; innovates in creating a new fundamental right out of a tradition that does not exist; casts doubt on the validity of Congress' determination that organized crime leaders kill witnesses against them; limits the coverage of the statute creating the Witness Protection Program; and requires hearings, many of whose major features are not described, and which are, in any event, wholly inadequate to meet the majority's own concerns, much less to deal with other serious problems. Perhaps the Attorney General can figure out what he may lawfully do next. I cannot.