**Donna RUFFALO, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

No. 80–0675–CV–W–6.

United States District Court,
W.D. Missouri, W.D.

June 29, 1984.

Sanford P. Krigel and Erlene W. Krigel, Krigel & Krigel, Kansas City, Mo., for plaintiff.

A. Mary Sterling, Asst. U.S. Atty., Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

SACHS, District Judge.

This much-discussed case [1] has now been tried to the court on the issue of damages. Plaintiff Donna Ruffalo's former husband, Michael Ruffalo, is a witness for the Strike Force who was taken into the Witness Protection Program (WPP) in November, 1978. Included in the program at the request of the father was Michael Ruffalo, Jr. (Mike), then 9 and now 14 years of age. Before entering the program, Mike had been in Mrs. Ruffalo's legal custody, but was simultaneously in the "possession" of his father, under a state court order based on a written agreement. Pursuant to the agreement, Mrs. Ruffalo had "reasonable visitation rights" and weekend "possession" for one day. P.Exh. 26. She generally saw Mike before and after school prior to his unannounced disappearance. After a period of great alarm, Mrs. Ruffalo was eventually advised by a Marshals Service official in Washington that the boy and his father were in the program. She thereafter had no word from Mike for almost four years. Telephone communication began in 1983, about the time of a court of appeals decision containing favorable analysis of her claims. In the meantime she had acquired full custody in a state court proceeding, and Michael Ruffalo was ruled in contempt of that court.

This litigation has been subject to several false starts. Acting under directions from the court of appeals, this court in May, 1983, held a hearing and ruled that Mrs. Ruffalo should not reacquire physical custody of Mike, but would be confined to limited visitation rights arranged by the Marshals Service, and would be entitled to frequent telephone calls. The court interposed its order, effectively modifying those of the state court, because there was proof of significant danger to the boy if he were placed in his mother's custody. The court also ruled that she was equitably barred from full injunctive relief because of her misconduct in accepting gifts from mortal enemies of Ruffalo, Sr., who viewed the litigation as a vehicle of intended homicide. *Ruffalo v. Civiletti*, 565 F.Supp. 34 (W.D. Mo.1983).

After discovery, clarification of the issues, and orders dismissing various parties, this damage claim went to trial under the Federal Tort Claims Act (FTCA). 28 U.S.C. § 1346(b). Under the statute, the United States is liable for personal injury (including emotional injury) caused by the negligent or wrongful act or omission of federal employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Application of the statute presents novel and significant issues under both state and federal law.

---

1. *See, e.g.,* "The Witness Protection Program: Investigating the Right to Companionship, Due Process, and Preemption," 59 Notre Dame Law Review 431 (1984).

The court must determine what rights have been invaded, whether there is federal responsibility, whether a damage suit could be maintained under state law for the harmful conduct, and what damages should be assessed. The findings of the court are embodied in this opinion, pursuant to Rule 52(a), F.R.Civ.Proc.

### A. Scope of Lost Rights

Plaintiff asserts a claim in excess of one million dollars for federal destruction of her right to custody of Mike, denial of due process, and interference with her parental role.[2] A psychologist testified that her loss may be described as "disenfranchisement as a parent," with ensuing damage to her mental health. The court views the deprivations in question more narrowly, and concludes they involved a right of visitation and oral communication, which was totally denied from November, 1978, until telephone calls were made by Mike in early 1983.

■■■ The court obviously accepts the ruling of the court of appeals that there was a denial of due process. *Ruffalo by Ruffalo v. Civiletti*, 702 F.2d 710 (8th Cir. 1983). Mrs. Ruffalo was entitled to a prompt post-deprivation hearing of the sort ultimately held by this court in 1983. She should have been immediately notified of Mike's safety, instead of being left in uncertainty for three or four weeks. The failure of the government to provide her with a forum in late 1978 (preferably after "temporary" relocation but before "permanent" relocation—P. Exh. 1, page 4) would not, however, create a claim for compensatory damages under the Constitution, absent a loss of substantive rights. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Compare *Owen v. Lash*, 682 F.2d 648, 657–660 (7th Cir.1982). No state law claim for this type of compen-

satory damages has been established by plaintiff's counsel. A claimed violation of the Constitution is insufficient in itself to assert liability under the Federal Tort Claims Act. *Boda v. United States*, 698 F.2d 1174, 1176 (11th Cir.1983).

■■■ The previous ruling of this court justifies the loss of custody suffered in 1978. It will be assumed that a state court, on similar evidence, would have confined Mrs. Ruffalo to rights of visitation and communication. Mike's entry into the protection program was procedurally faulty but substantively proper, therefore, and Mrs. Ruffalo cannot complain of that loss, however real it may have been. She may complain, however, of deprivations exceeding those she now suffers, if traceable to negligence or wrongful federal conduct. Under current orders she is entitled to semi-annual visitation and bi-weekly telephone calls. These are the rights of which she was deprived for approximately four and one-half years.[3]

### B. Federal Responsibility

■■■ The government strenuously denies responsibility for the deprivations of visitation and communication. It attributes these losses entirely to Michael Ruffalo for not requiring his son to contact the mother (except for one unpleasant letter to her in August, 1982). The court of appeals has ruled, however, that Michael Ruffalo, whose wishes the boy obeys, may be considered a federal actor, for purposes of discerning a constitutional violation. 702 F.2d at 717. While that alone may not render him an "employee," within the statutory terminology, this court would hesitate to create a distinction making the Federal Tort Claims Act inapplicable to Michael Ruffalo's conduct. If fine lines are to be drawn between a federal actor and a

---

**2.** The court was advised at the "custody hearing" of plaintiff's more realistic negotiating figure of $110,000, of which $10,000 would go to the mother and the balance would be held in trust for the boy and his half-sister Angela.

**3.** The court initially ordered quarterly visits and weekly telephone calls. Further evidence satis-

fied the court that so much forced contact is excessive, given the unhappy relationship between Mike and his mother. The visitation and communication privileges were accordingly modified. See this court's order of June 28, 1984.

federal employee, they should be drawn by the court of appeals.

Governmental responsibility may be established, moreover, using different approaches. Marilyn Mode, assistant chief for planning and evaluation, witness security division, United States Marshals Service, testified that the Marshals Service has not required visitation or contact between children in the program and parents who are outside the program. Whether such visitation and contact occurs has been dependent on the wishes of parents and children in the program. In other words, it was optional or entirely voluntary, rather than a duty, for such persons to agree to visits. Assuming visitation rights to be mandated by state law (which the witnesses agreed was normal and which the court believes to be almost universal) this means that entry into the program, when coupled with the past method of administration, has had the effect of destroying a pre-existing legal right. Intentional interference with visitation rights may therefore be imputed to the governmental sponsor of the Witness Protection Program. A similar ruling has been made by the Court of Appeals for the District of Columbia. *Franz v. United States*, 707 F.2d 582, 590–4 (D.C.Cir.1983).

The only arguable justifications for such interference would appear to be (1) security of the participants; (2) financial considerations; or (3) lack of "authority" or control. Only the last factor is here developed as a defense. The evidence is clear, however, that Michael Ruffalo can easily be persuaded and accepts instructions from the Marshals Service in many respects. He travels when they want him to travel. He telephones when requested by the marshals. He testifies when needed. He instructs Mike to telephone his mother or to visit her. Such telephoning began *before* this court ordered the father to take such

action, apparently after the defendants became concerned about the outcome of this case. Michael Ruffalo assumes significant physical risks when requested.[4] There is no evidence that he has rejected any urgent, insistent request from the marshals. It is concluded that Michael Ruffalo was sufficiently within the practical control of the Marshals Service so that he would have acquiesced in allowing visitation and in directing his son to talk to the mother from 1978 to 1983, if urgently requested. The injury suffered is thus attributable at least in part to the conduct of the Marshals Service in administering the program. Causation has been adequately demonstrated.

At least one government agent, FBI agent Leone J. Flosi, told Michael Ruffalo he need not appear in state court because that court had "no jurisdiction." Ruffalo's attorney, paid by the government, similarly resisted jurisdiction in reopened state court proceedings in 1981. While Flosi's advice may have been motivated by concern for Ruffalo's safety, the message to Ruffalo was that he could completely disregard Donna Ruffalo's rights. Any urging to the contrary by Marshals Service personnel must have been in the nature of very mild advice, and there was no withdrawal of the prior information that Michael Ruffalo was in total control of the decision. Such power of veto, granted to the witness by the marshals, was clearly contrary to state law.

The deprivation of rights, financed by the government and fostered by federal practices and advice, was thus aided and abetted by federal employees who generally remain unidentified. They were participants in the violation. If private persons would be liable for damages for participating in such conduct under state law, there should be federal liability under the plain

---

**4.** The only exception is his unwillingness to accept the risk of being incarcerated in the Jackson County Jail, which he believes would result from an appearance in state court. He believes he could not survive if this happened. The court questions whether his advisers were as innovative as possible in arranging for a court appearance, but need not explore the question. It is not analogous to the limited surrender of paternal control that has occurred under the court's decision in 1983, and which the court believes could always have been achieved if the Marshals Service had exercised its powers of persuasion.

words of the Federal Tort Claims Act. But before reviewing questions of family law, I deal with several additional defenses.

■ It is the government's contention that I should grant it qualified immunity, and hold that there is no liability because its personnel acted in good faith and the legal issues were unclear. I have recently ruled that defendants Civiletti and Hall are entitled to such immunity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). I do not find qualified immunity, as a governmental defense, referred to or implied in the FTCA, and agree with the ruling in *Arnsberg v. United States,* 549 F.Supp. 55 (D.Ore.1982) that "the good faith defense available to individual government officers is not available to the government itself." *Id.* at 57. See also Judge Butzner's persuasive dissenting opinion in *Norton v. United States,* 581 F.2d 390 (4th Cir.1978). In any event, the federal employees responsible for the administrative details of the Witness Protection Program have not come forward to assert a good faith defense for their participation in the violation of visitation and communication rights of Mrs. Ruffalo. Ms. Mode's theory that Marshals Service personnel felt inhibited by lack of authority to control the private life of a witness and his child has not been squared with the agreement to honor custodial orders, consented to by the witness when entering the program, as set forth in the "Memorandum of Understanding" (P.Exh. 1, page 7), or with the actual ability of the marshals to exert influence and control.[5]

■ The government further contends that it is protected by the discretionary function exception to the FTCA. 28 U.S.C. § 2680(a). It relies primarily on *Bergmann v. United States,* 689 F.2d 789 (8th Cir.1982). The *Bergmann* decision establishes that the exception is not strictly confined to "the planning or policy level versus operational level distinction" previously used in the circuit. *Id.* at 791. Where discretion has been delegated for individual decision-making, the delegated subject matter is within the exception. As I understand the rule, it is related to a preemption concept, and establishes that when federal actions have been *authorized,* no complaint will be heard that a tort has been committed under state law.

Congress has protected the government from damages when there is simply an erroneous exercise of discretion, or even an abuse of discretion, in carrying out governmental responsibilities. *See e.g., United States v. S.A. Empresa de Viacao Aerea Rio Grandense,* —— U.S. ——, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The discretionary function exception would thus protect authorized conduct, even if mistakes have been made. For example, if visitation or communication rights were terminated because the marshals had made a mistaken appraisal of danger, such conduct would not be actionable under FTCA. *See Franz v. United States,* 712 F.2d 1428, 1429 (D.C. Cir.1983).[6] But a wholly unjustified violation of state law rights involves more than an abuse of discretion, unless it is deemed that Congress intended to grant the Marshals Service complete authority to override state court orders and all aspects of parental rights recognized by state law, for any reason or for no reason. I do not

---

**5.** Some mention should be made of plaintiff's contention that there was negligence in failing to determine that Mrs. Ruffalo had legal custody of Mike before including him in the program. Arguably the authorities should have determined, as the court of appeals did, that Mrs. Ruffalo was the custodial parent. But the agreement between the parents confirms the father's right to "possession." In any event I have concluded that he should be the custodial parent, for all practical purposes. There may have been negligence in failing to consider the mother's visitation and communication rights, but I believe the governmental action and inac-

tion effectively destroying those rights was deliberate and intentional, to the extent the question may have been given any consideration by the supervising marshals.

**6.** No security qualms are suggested here, except tangentially in briefing the case. On the contrary, the predominant theme is that maternal contact was *advocated* and even visitation was supposedly *favored* by the government, as government counsel stated at the "custody hearing" in 1983.

accept such an inference of total preemption. See discussion by Judge Bork in his concurring and dissenting opinion in *Franz v. United States*, 712 F.2d 1428, 1435–6 (D.C.Cir.1983). It is more reasonable to assume a Congressional intent that there be an "accommodation" of interests, as Judge Bork suggests at page 1436. The total disruption of plaintiff's parental rights was, in this case, unauthorized conduct rather than a protected exercise of discretion.

The government further relies on the *Bergmann* case for a contention that the Marshals Service could have exercised discretion by terminating supervision of the Ruffalos. Even assuming the government could have washed its hands of this affair, that did not happen. While the government may in general exercise discretion to terminate supervision of minute details of the life of a witness, it cannot validly assert it has done so in this case. For example, it swiftly produces the Ruffalos for telephone conversations when that suits the purposes of the Marshals Service but disclaims the ability to persuade the Ruffalos when requested conversations do not serve any governmental preference. As the court has previously found, the pertinent controls remain in place, and federal responsibility continues.

### C. State Law Liability for Interference With Visitation

■ I turn now to questions of state law. This lawsuit is probably the first reported instance in any jurisdiction in which there has been a contested trial to determine the liability of persons who interfere with a parent's visitation and communication rights.[7] Interference with full custody is, however, a generally recognized tort. *Kramer v. Leineweber*, 642 S.W.2d 364

(Mo.App.1982); *Kipper v. Vokolek*, 546 S.W.2d 521 (Mo.App.1977); *Wood v. Wood*, 338 N.W.2d 123 (Iowa 1983); *Lloyd v. Loeffler*, 694 F.2d 489 (7th Cir.1982). While the injury to parental rights may be less severe in a case involving what is usually called visitation, that is a matter of degree that logically relates to damages rather than liability.

The Vermont Supreme Court has recognized a cause of action for denying a parent "personal contact or other communication." *Sheltra v. Smith*, 136 Vt. 472, 392 A.2d 431 (1978). No claim of custody was pleaded in the *Sheltra* case, and it is inferred that the claim arose in favor of a noncustodial parent. Government counsel concedes as much.

One reported decision has rejected damage claims for interference with visitation rights. *McGrady v. Rosenbaum*, 62 Misc.2d 182, 308 N.Y.S.2d 181, *aff'd* 37 A.D.2d 917, 324 N.Y.S.2d 876 (1970). The decision has been criticized. *Wood v. Wood, supra*, 338 N.W.2d at 125 n. 1 ("unresponsive to the problems of interstate parental kidnapping"). I believe *McGrady* is not likely to be followed by courts that are adequately sensitive to the significance of " 'frequent and continuing contact with both parents after the parents have separated or dissolved the marriage.' " *Id.*, 129 (dissenting opinion, quoting Iowa statute). *See Hahn v. Hahn*, 569 S.W.2d 775, 778 (Mo.App.1978) (McMillian, J.).[8]

*McGrady* may be explained in terms of a strong New York policy against alienation of affections litigation. It also evidences some reluctance to entertain novel claims that may burden the courts. A similar viewpoint is expressed in the dissent in *Wood v. Wood, supra.* It may simply be

---

7. Government counsel commendably advises the court of an uncontested damage suit of this nature in an Illinois trial court. See the reference to *Johannes v. Sloan*, No. 79–L–169 (Kankakee Cty.Cir.Ct. March 25, 1981) in a casenote, 46 Mo.L.Rev. 829, 837 n. 45 (1981).

8. The *Hahn* opinion observes that court approved moves from the state of domicil of the noncustodial parent are often sanctioned, even

though the right of visitation will thereby be "curtailed or destroyed." This suggests that in the ordinary WPP case the government need not incur extraordinary expenses, such as maintaining visitation rights on a frequent basis, if there has been due process for the noncustodial parent and if all reasonable efforts are exerted to maintain contact, particularly telephone and mail communication and infrequent visitation.

somewhat dated, having been decided prior to the increased judicial sensitivity to the rights of children and of both parents.[9]

The government argues that the court should not "create a cause of action for tortious interference with visitation" because this would invite burdensome litigation whenever a child is "late for the family picnic or misses a weekly phone call." The court is aware that its path is unmarked by local precedent, but does not believe it is "creating" any rights that would not be recognized by a Missouri court at this time.

The argument against encouraging damage claims for petty infractions of parental rights is not pertinent to the facts of this case. The state courts could well restrict this type of claim to situations that are not "insubstantial in duration and effect." As this court has once before noted, Judge Seymour would treat a governmental interference with visitation rights as a constitutional violation only when the challenged governmental conduct is of a serious, continuing nature. *Wise v. Bravo*, 666 F.2d 1328, 1338 (10th Cir.1981) (concurring opinion). In any event, trifling departures from court orders relating to visitation doubtless already plague the state courts in contempt cases, and the possibility of truly petty damage suits does not argue persuasively against recognition of a right to sue. on the contrary, there are specialists in family law who view the potential of damage suits as a useful deterrent to lawless conduct. Hoff, *supra.*

The government further argues that "perhaps such a tort should be recognized, but surely not [in] this case given the intent of the mother ..." etc. Plaintiff's case, all in all, does not command a high level of sympathy, but the court must be on guard against using a hard case to make bad law.

Contrary to the government's argument, I do not read the Missouri decision of *Kipper v. Vokolek*, 546 S.W.2d 521 (Mo.App. 1977), as being contrary to my conclusions. While the plaintiff in that case did assert loss of companionship of a child, and was defeated in litigation because he did not have lawful custody, he seems to have been asserting no less than a right to custodial-type companionship. The *Kipper* opinion does refer to the New York holding pertaining to visitation rights, *McGrady v. Rosenbaum*, but the Missouri court had no occasion to adopt or reject *McGrady*, and took no discernible position on the *McGrady* issue.

The government's most persuasive argument against recognition of a cause of action for interference with visitation rights is founded on an analogy to Missouri's rejection of claims for loss of society of a parent (or child) in personal injury cases. *Bradford v. Union Electric Company*, 598 S.W.2d 149 (Mo.App.1979). The Missouri law on such losses has been changing, generally in a more compensatory direction. In 1963 the Supreme Court authorized wives to assert loss of consortium claims. *Novak v. Kansas City Transit, Inc.*, 365 S.W.2d 539 (Mo.1963). Loss of a child's society is now compensable in death cases; no distinction is made between the custodial and noncustodial parent. § 537.090, RSMo. Moreover, the distinction between direct interference with a right of association and the indirect effects of an accident probably sufficiently distinguishes *Bradford*. It is one thing for the courts to adopt rules that limit the "ripple effect" of an accident, but it would be quite another to hold that there can be no compensation

**9.** The Director, Child Custody Project, National Legal Resource Center for Child Advocacy and Protection, American Bar Association, criticizes *McGrady* as a case reflecting "a judicial conservatism which did not adequately address the problems inherent in interstate custody kidnappings, particularly those involving concealment ...." Patricia M. Hoff, "Interstate Child Custody Disputes and Parental Kidnapping: Policy, Practice and Law" (Legal Services Corporation-ABA 1982), page 14–15. Hoff's criticism of *McGrady* was noted by the Iowa Supreme Court in *Wood v. Wood, supra.*

when the injury is the direct result of the defendant's conduct.

A final consideration favoring liability relates back to the constitutional issue. I have previously ruled that unjustified governmental interference with visitation rights violates the Fifth Amendment. *Ruffalo v. Civiletti*, 539 F.Supp. 949, 952 (W.D. Mo.1982). Judge Seymour's view in a Fourteenth Amendment case, *Wise v. Bravo, supra*, is to the same effect. A Ninth Circuit ruling recognizes a noncustodial mother's constitutional claim to a right of access to her child. *Morrison v. Jones*, 607 F.2d 1269, 1275 (9th Cir.1979). *See also Franz v. United States, supra*, 707 F.2d at 597, 602, 603. The government does not presently quarrel with such rulings. Counsel surmises, however, that a Missouri state court would likely rule that there was no common law tort claim but "only" a violation of the Constitution. Such belittlement of constitutional rights is not to be routinely anticipated.

In a recent FTCA case, a district judge in Michigan concluded that Alabama would probably incorporate constitutional violations into its common law of damages. *Bergman v. United States*, 579 F.Supp. 911, 934–5 (W.D.Mich.1984). It is not necessary to survey Missouri law on this point, to determine if incorporation of constitutional torts would be automatic. It is sufficient to suppose that where this particular constitutional violation has occurred in a familiar area of tort law, it is quite likely that a state court would be persuaded to hold that the common law is sufficiently flexible to treat the incident as tortious.

■ The parties tacitly accept the applicability of the law of Missouri, where Donna Ruffalo suffered the deprivation here in issue. Even if unknown persons along the banks of the Potomac or at the Ruffalo hiding place may be causally responsible

for the break in communication and visitation, no conflict of laws is perceived. While I must necessarily make an educated guess as to state law, I conclude that most state courts would now recognize a damage suit for interference with visitation rights. The government is therefore liable for damages to Mrs. Ruffalo.

### D. Damages

There is no direct proof of the extent of Mrs. Ruffalo's compensable loss. Most of her loss is apparently attributable to the loss of parental control that relates to full custody. Valuation of a right to occasional visitation and frequent telephone calls requires an imprecise estimate. It is appropriate to first consider the size of the ball park.

Juries in contested cases have recently placed values of $65,000 and $70,000 on destruction of the whole package of custodial rights, when defendants have aided and abetted child-snatching from the custodial parent. *Lloyd v. Loeffler, supra, Fenslage v. Dawkins*, 629 F.2d 1107 (5th Cir. 1980). Valuation begins with those verdicts, which in my judgment are on the low side. Because this court has sanctioned what is in effect a change of custody, the loss of custody which is the major element in such a claim is not compensable. Moreover, the *Lloyd* and *Fenslage* cases involved a continuing deprivation that could become a permanent estrangement, whereas Mrs. Ruffalo has been restored to all the rights to which she is entitled.

I need not review the sordid evidentiary details presented by the parties regarding the characters of both Donna and Michael Ruffalo.[10] The evidence ostensibly related to credibility and also served to help measure Mrs. Ruffalo's parental feelings. The weight of the evidence shows that Mrs.

---

**10.** Plaintiff has of course been unable to investigate the conduct of Michael Ruffalo since November, 1978. It will be charitably assumed that he is both a model parent and a law-abiding citizen.

Ruffalo has a substantial measure of loving feelings toward her son, and more particularly demonstrates her strong sense of deprivation. I do disbelieve much of her testimony, but something of value remains. Her sister's testimony and that of Ms. Glorioso had some probative use in confirming that Donna Ruffalo was seriously disturbed by her plight, including her loss of communication with her son. Even the seriously estranged members of the family, including the former husband, son and daughter, testified to some matters showing strong feelings, such as a maternal "kidnapping" incident. None of the family members convincingly expresses any great skepticism about Mrs. Ruffalo's present feelings toward her son, or the feelings she had between November, 1978 and May, 1983. Some of the testimony against Mrs. Ruffalo was exaggerated, or reflected unreliable childhood memories having little current significance. Some of it is probably true, but a recitation is not necessary to my estimate of damages, and would needlessly record in print the annals of this unhappy plaintiff.

 I will value the visitation and communication loss during the first year of deprivation at $8,000, and will assess $2,500 each for subsequent years, including $1,500 for the period after November, 1982. Judgment will be entered in favor of Donna Ruffalo and against the United States in the sum of $17,000.

SO ORDERED.