507 A.2d 607

**Jonathan D. HIXON**

v.

**Paul BUCHBERGER.**

**No. 77, Sept. Term, 1985.**

Court of Appeals of Maryland.

May 1, 1986.

L. Marc Zell (Morris Topf, Sheila Kaplan and Topf, Zell, Goldstein & Handler, on brief), Bethesda, for appellant.

James S. Williford, Jr. (Coggins, Harman, Lackey & Lowe, P.A., on brief), Silver Spring, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

RODOWSKY, Judge.

After the trial court held that his complaint failed to state a claim, the petitioner asked us to recognize as part of Maryland common law a cause of action for money damages based on intentional interference by a nonparental, noncustodial third party with the child visitation rights of a noncustodial parent. The intentional interference alleged here is primarily belligerent and hostile statements made to the petitioner, Jonathan D. Hixon (Hixon). We agree that his complaint does not state a damage claim. Our explanation follows.

Hixon's visitation rights were judicially declared in a kind of reverse paternity action brought by him, as putative father, in the Circuit Court for Montgomery County against Linda A. Liebelt (Liebelt), who had borne a child out of

wedlock.[1]  A consent decree in that case, dated August 13, 1984, recited that the results of certain biomedical laboratory tests indicated the probability that Hixon was the father of the child.  The court declared, *inter alia,* that Hixon was the father, that the child's name was to be David Charles Hixon, that Liebelt was to have custody, and that Hixon had specified visitation rights.  Following this decree Liebelt and the child resided with the respondent, Paul Buchberger (Buchberger).  Liebelt subsequently married Buchberger who was Liebelt's fiancee at the time of the alleged interference with visitation.

In his complaint filed November 28, 1984, the heart of Hixon's allegations describing the interference is

[t]hat on November 16, 1984, at a time when [Hixon] lawfully went to [Liebelt's and Buchberger's] address to pick up the minor child for visitation purposes, the Defendant Buchberger began making belligerent and hostile statements to [Hixon] in the presence of the minor child, stating that [Hixon] was not really the child's father. The said Defendant Buchberger made it difficult for the Plaintiff, Jonathan D. Hixon, to physically take his child with him to exercise normal visitation, at times the Defendant flatly refused to surrender the child to [Hixon] and repeatedly threatened violence.

These allegations are at best ambiguous.  Literally they describe a single incident occurring on November 16, 1984, at which Buchberger "made it difficult for [Hixon] to physically take his child with him."  Hixon does not aver that Buchberger actually prevented him from taking the child with him.  Additionally, Hixon alleges that "at times the Defendant flatly refused to surrender the child to [Hixon]."  If the intent of the pleader were thereby to

---

1.  While we use the expression "visitation rights" in this opinion, we have also used the term "privilege" when speaking of the provisions in a decree concerning visitation with minor children. *See Stancill v. Stancill,* 286 Md. 530, 533, 537, 538, 408 A.2d 1030, 1032, 1034, 1035 (1979).

allege that on other occasions ("times") Hixon was actually prevented from taking the child with him by Buchberger's flat refusals to surrender the child, it would be unusual pleading to emphasize one incident of November 16 when the interference resulted only in the exercise of visitation rights being made "difficult," whereas interferences on other occasions prevented any visitation at all. Under these circumstances we apply the rule that ambiguities in the pleading are to be construed against the pleader. *See Read Drug and Chemical Co. v. Colwill Construction Co.,* 250 Md. 406, 416, 243 A.2d 548, 555 (1968). Consequently we interpret the complaint's references to flat refusals as specifying types of hostile statements made in the course of the confrontation on November 16.

Hixon further alleged that Buchberger's conduct made it obvious that Buchberger intended to supplant Hixon in the child's mind as the child's father. Buchberger's actions were characterized as "malicious and committed in an outrageous, hostile and belligerent manner, calculated to put [Hixon] in fear for his safety." To compensate him for this interference with his visitation rights Hixon seeks $10,000. To vindicate a perceived societal interest in punishing and deterring the conduct described, Hixon asks that Buchberger be ordered to pay him $75,000 in punitive damages. Hixon also demands a jury trial.

The complaint in this case was filed in two counts. The first count, seeking an injunction, was dismissed by the trial court, with leave to amend, at the conclusion of oral argument on Buchberger's motion and that count was abandoned on appeal. The second count, claiming a tort by way of interference with visitation rights, was taken under advisement and subsequently dismissed without any express grant or denial of leave to amend. Hixon never sought leave to amend count II from the trial court. We issued the writ of certiorari prior to the consideration of Hixon's appeal by the Court of Special Appeals.

At oral argument before this Court Hixon's counsel reviewed the facts. That description confirms that the allegations, as interpreted above, are the facts on which Hixon relies. We were told:

> Sometime in November of 1984, I believe, an incident which was, I understand, typical of the relationship generally, but a particularly grievous incident took place where Mr. Hixon attempted to exercise visitation rights and the defendant overtly interfered with it by making a number of abusive statements to the child who was approximately two years old at the time, I believe, and to the effect that Hixon was not the father of the child, ... physically restrained the child, and threatened physical violence against Mr. Hixon and this was all set forth in the complaint. Thereafter the filing—the complaint was filed, by the way, roughly twelve days after this particular incident took place.

During oral argument Hixon's counsel never categorically represented that Buchberger prevented Hixon from visiting with his child on the occasion of this "particularly grievous incident." Buchberger's counsel, on the other hand, both in brief and at oral argument emphasized that the allegations refer to a single incident and that they fail to state that the visit was prevented on that occasion. Consequently we view the alleged interference as consisting primarily of belligerent and hostile statements.

We begin our analysis by emphasizing what this case does not present. Hixon does not contest the dismissal of his claim for an injunction. We are not concerned with whether Liebelt violated the consent decree or with whether a proceeding for contempt would be available against her.[2] Nor does Hixon raise the question of whether knowing and intentional interference by Buchberger with Hixon's court-ordered visitation could be the basis for an application for contempt by Hixon against Buchberger directly. *Cf.* Fed.R.

---

**2.** We are advised that Hixon did petition in the action giving rise to the consent decree that Liebelt be found in contempt.

Civ.P. 65(d) ("Every order granting an injunction ... is binding only upon the parties to the action ... and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."). While Hixon's point is that Buchberger's conduct is a tort for which money damages will lie, Hixon does not allege that the interference constituted an assault or a battery. The complaint does not undertake to describe conduct which is " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community,' " *Harris v. Jones,* 281 Md. 560, 567, 380 A.2d 611, 614 (1977) (quoting Restatement (Second) of Torts § 46 comment *d* (1965)), and Hixon does not argue that Buchberger committed an intentional infliction of emotional distress.

Our decisions involving interference with the relationship between parent and child do not assist Hixon's position. These cases, decided in the decades on both sides of the turn of the last century, dealt with that tortious interference with domestic relations known as enticement or abduction of a child. *See generally Prosser and Keeton on the Law of Torts,* § 124, at 924–25 (W.P. Keeton 5th ed. 1984). Those Maryland cases state the prerequisites of that tort to be that the parent have the right to custody and that actual service have been rendered by the child to the parent which the parent lost due to the abduction, enticement, or harboring by the defendant. *See Kenney v. Baltimore and Ohio Railroad Co.,* 101 Md. 490, 61 A. 581 (1905) (suit dismissed for insufficient evidence of enticement or service); *Baumgartner v. Eigenbrot,* 100 Md. 508, 60 A. 601 (1905) (insufficient evidence of abduction and harboring where minor child left voluntarily to stay with relative); and *Loomis v. Deets,* 30 A. 612 (Md.1894) (insufficient evidence of enticement or harboring).

Under the rules for this tort espoused in Restatement (Second) of Torts (1977), "loss of service or impairment of ability to perform service is not a necessary element of a

cause of action." § 700 comment *d.* The general rule there formulated is that

> [o]ne who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.

Under § 700 a custodial parent who suffers the tort can recover damages for the loss of society of the child, for emotional distress resulting from abduction or enticement, for loss of service, and for the reasonable expenses of regaining the child and in treating any harm suffered by the child as a result of the tortious conduct. Comment *g.* Of principal significance for present purposes is that the § 700 tort lies only at the instance of a custodial parent. Comment *c* underscores that requirement. In part it reads that "[w]hen by law only one parent is entitled to the custody and earnings of the child, only that parent can maintain an action under the rule stated in this Section." The corollary to the foregoing rule is that "[o]ne parent may be liable to the other parent for the abduction of his own child if by judicial decree the sole custody of the child has been awarded to the other parent." Comment *c.*

Illustrative of the rules found in Restatement § 700 are *DiRuggiero v. Rodgers,* 743 F.2d 1009 (3d Cir.1984); *Lloyd v. Loeffler,* 694 F.2d 489 (7th Cir.), *aff'g,* 539 F.Supp. 998 (E.D.Wis.1982); *Bennett v. Bennett,* 682 F.2d 1039 (D.C. Cir.1982); *Fenslage v. Dawkins,* 629 F.2d 1107 (5th Cir. 1980); *Hinton v. Hinton,* 436 F.2d 211 (D.C.Cir.1970); *Wood v. Wood,* 338 N.W.2d 123 (Iowa 1983); *Kipper v. Vokolek,* 546 S.W.2d 521 (Mo.App.1977); and *Brown v. Brown,* 338 Mich. 492, 61 N.W.2d 656 (1953), *cert. denied,* 348 U.S. 816, 75 S.Ct. 27, 99 L.Ed. 644 (1954). *Cf. Kajtazi v. Kajtazi,* 488 F.Supp. 15 (E.D.N.Y.1978) (Where the court hearing a divorce action between parents had awarded to the mother *pendente lite* custody of their son whom the father abducted and took to Yugoslavia, it was held under New York law that the mother could recover damages from

accomplices of the father on the theory of intentional infliction of emotional distress.).

Hixon contends that Maryland law should not limit monetary recoveries in cases of intentional interference with parent-child relations to interferences with custody. He urges that a proper recognition of the interests of a parent who is awarded visitation rights includes recognition of a cause of action for damages for intentional interference with visitation rights. Hixon sees support for his position in the cases reviewed below because, although they are not uniform with regard to the underlying legal theory, they recognize that there may be an action for money damages by a parent who does not have legal custody.

In *L.S.J. v. E.B.*, 672 S.W.2d 937 (Ky.App.1984), the mother gave birth on July 31, 1979, while incarcerated on a forgery charge. The baby was placed in the custody of the state human relations agency which in turn placed the baby in foster care. About two years later the agency moved the baby to another foster home closer to the mother's place of confinement. The original foster parents, in violation of a contract with the agency, brought suit to terminate the mother's parental rights and obtained an *ex parte* order awarding them temporary custody and terminating all visits between the mother and child. After receipt of the order the mother counterclaimed for damages but the trial court dismissed the counterclaim. The appellate court reversed, announcing its "belief that the only way to curtail such conduct as [the foster parents] resorted to is to permit the tort law to operate and address the wrongdoing." *Id.* at 940. The opinion describes the counterclaim as seeking damages "on the basis of the foster parents' interference with [the mother's] relationship with her daughter and alienation of her daughter's affections." *Id.* at 938.

Relief has also been granted to the noncustodial parent on the theory of intentional infliction of emotional distress. In *Raftery v. Scott*, 756 F.2d 335 (4th Cir.1985), the court affirmed a money judgment based on a jury verdict in favor

of a noncustodial father. The mother left the State of New York with her two-year-old son in May 1977, one month before a New York divorce decree awarded her custody. It was not until December 1981 that the father learned that the mother had remarried and taken up residence in Virginia with the child. In February 1982 the father sued in a Virginia state court to enforce the visitation provisions of the New York decree. In that proceeding a court-ordered mental health evaluation of the child concluded that the father should not have visitation rights because of the emotional impact on the child. The father, meanwhile, had sued in federal district court claiming intentional infliction of emotional distress under Virginia law. He obtained a money judgment which was reviewed by the Fourth Circuit in *Raftery*. Because the appellate issues concerned the domestic relations exception to federal diversity jurisdiction and the Virginia law of alienation of affections, the Fourth Circuit simply noted that "[t]here was evidence clearly sufficient to establish that the former wife had engaged in a continuing and successful effort to destroy and to prevent rehabilitation of the relationship between the former husband and their son." *Id.* at 337. *See also Sheltra v. Smith*, 136 Vt. 472, 392 A.2d 431 (1978) (holding that a cause of action for the intentional infliction of emotional distress was stated by allegations that the defendant had rendered impossible any personal contact or other communication between the plaintiff and her daughter);[3] *Bartunus v. Lis*, 332 Pa.Super. 48, 480 A.2d 1178 (1984) (holding that an allegation that plaintiff's sister and brother-in-law enticed plaintiff's son to stay away from his father was sufficient to state a potential cause of action for intentional infliction of emotional distress).

Because Hixon does not argue that he is the victim of an intentional infliction of emotional distress, we express no

---

**3.** *Sheltra* does not explicitly state that the plaintiff was a noncustodial parent but at least one other court has assumed that the plaintiff did not have custody. *See Ruffalo v. United States*, 590 F.Supp. 706, 711 (W.D.Mo.1984), discussed *infra*.

opinion whether the facts in any of the three cases reviewed above are sufficient to establish that tort under Maryland law.

Hixon relies principally on *Ruffalo v. United States,* 590 F.Supp. 706 (W.D.Mo.1984), in which a money judgment was entered under the Federal Tort Claims Act. The plaintiff mother had had legal custody at the time her former husband and, at his request, their son, were taken into the federal Witness Protection Program and given new identities. In an earlier proceeding the court had found that the mother had been receiving payments initiated by the "boss" of the Kansas City Mafia to encourage her to litigate an injunction claim for return of the child. The court further found that "there can be little doubt that she knows that her actions are being rewarded because they may bring about the death of her former husband." *Ruffalo v. Civiletti,* 565 F.Supp. 34, 35–36 (W.D.Mo.1983). The federal court assumed that a state court, on similar evidence, would have confined the mother's rights to visitation and communication. The court then reasoned:

Assuming visitation rights to be mandated by state law ... this means that entry into the [witness protection] program, when coupled with the past method of administration, has had the effect of destroying a pre-existing legal right. Intentional interference with visitation rights may therefore be imputed to the governmental sponsor of the Witness Protection Program. [*Ruffalo,* 590 F.Supp. at 709.]

The court rejected the government's "argument against encouraging damage claims for petty infractions of parental rights" as "not pertinent to the facts of this case." *Id.* at 712. The court suggested that "state courts could well restrict this type of claim to situations that are not 'insubstantial in duration and effect'" but went on to say that

[i]n any event, trifling departures from court orders relating to visitation doubtless already plague the state courts in contempt cases, and the possibility of truly petty damage suits does not argue persuasively against recog-

nition of a right to sue. On the contrary, there are specialists in family law who view the potential of damage suits as a useful deterrent to lawless conduct. [*Id.*] The federal court then made "an educated guess," *id.* at 713, that Missouri would recognize a damage suit for interference with visitation rights and assessed damages to the mother for the deprivation of those rights. The damages covered the period of five years during which there had been no contact prior to the time semi-annual visitations and bi-weekly telephone conversations between mother and son, under security conditions, were ordered.

A noncustodial father's visitations were also totally prevented when his former wife and their children, of whom she had custody, changed their identities in the Witness Protection Program which they had entered with the man whom the mother had married. A divided panel of the United States Court of Appeals for the District of Columbia Circuit held that the father's complaint survived a motion to dismiss. Viewing the case as "a narrow factual situation in which the government has acted to sever completely all ties between a non-custodial parent and his children without their participation or consent," the majority said the federal constitutional rights of the father had been infringed. *Franz v. United States,* 707 F.2d 582, 602 (D.C.Cir.1983), supplemented by 712 F.2d 1428 (D.C.Cir.1983). In a concurring and dissenting opinion in *Franz,* Judge Bork read the majority's constitutional analysis as employing substantive due process and said:

Since the Constitution itself provides neither textual nor structural guidance to judges embarked upon this chartless sea, it behooves us to be cautious rather than venturesome. I think the majority is unduly bold in what it does here. The Supreme Court has established procedural constitutional protections for various relationships within the family. The Court has never enunciated a substantive right to so tenuous a relationship as visitation by a non-custodial parent. The reason for protecting the family and the institution of marriage is not merely that

they are fundamental to our society but that our entire tradition is to encourage, support, and respect them. . . . That cannot be said of broken homes and dissolved marriages. [712 F.2d at 1438 (citations omitted).]

■ It is apparent from the foregoing review that the interference alleged here falls short, by a considerable distance, of the more substantial interferences presented in many of the cases relied upon by Hixon. The belligerent words described by Hixon are a relatively minor interference. Indeed, the nature of the interference alleged here is so minor that it is doubtful whether most courts would recognize it as mounting up to a tortious interference with custody rights, remediable by damages, were the same verbal exchange to have taken place when a custodial parent might be picking up a child at the end of a visit with a noncustodial parent. Consequently we need not decide in this case whether, or, if so, under what circumstances a damage action might lie for interference with visitation rights. We hold simply that a parent or that parent's ally who, without committing any tort presently recognized in Maryland, speaks hostilely to the other parent about that parent's exercise of custody or visitation rights does not thereby become liable in damages.

■ This Court does not accept that portion of the reasoning in *Ruffalo* which indicates that, because they deter (or might deter) illegal conduct, damage suits are a desirable remedy, even for relatively minor interferences with visitation rights. Nor do we agree with the *Ruffalo* court's view that, because minor disputes over visitation must be heard in applications for contempt, there is no burden on courts in hearing much the same evidence in a damage suit. Overarching all of the contentions in disputes concerning custody or visitation is the best interest of the child. But a damage action for interference with the transfer of a child from custody to a visitation, or *vice versa,* based on words spoken, even if they are objectively hostile and belligerent, would not seem to be generally in the best

interest of the child involved. Inevitably the defense in such cases will be that the claimed interference by speaking was really an effort to protect the child from some detriment. Such issues should be resolved by the chancellor as an adjunct to jurisdiction over the child and not by a jury in the context of awarding or withholding damages between litigating adults.

Further, a variety of equitable remedies and existing torts are available as legal relief to one who suffers a more substantial harm than Hixon alleges here. We are not persuaded that an additional weapon is needed in the arsenals of divorced or separated parents to deal with harsh words passing between them over the exercise of custody or visitation rights. There need not be a damage suit to remedy every annoyance which one encounters in life.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY JONATHAN D. HIXON.