*Gregory Haines v. Gretchen Vogel*, No.1789, September Term 2019. Opinion by Wells, J.

**CIVIL PROCEEDURE – MOTION TO DISMISS – FAILURE TO STATE A CLAIM – STANDARD OF REVIEW**

Appellate courts apply a de novo standard of review to determine whether a trial court's dismissal of a complaint was legally correct.

**TORTS – INTENTIONAL INTERFERENCE WITH PARENTAL RELATIONS – REQUIRED ELEMENTS OF THE COMPLAINT**

Based on the precedent established by this Court in *Lapides v. Trabbic*, 134 Md. App. 51 (2000), and the precedent established by the Court of Appeals in *Hixon v. Buchberger*, 306 Md. 72 (1986) and *Khalifa v. Shannon*, 404 Md. 107 (2008), we hold that to properly assert a complaint for intentional interference with custody or visitation, a petitioner must allege the physical removal and harboring of the child from the other parent.

**TORTS – INTENTIONAL INTERFERENCE WITH PARENTAL RELATIONS – REQUIRED ELEMENTS OF THE COMPLAINT**

Allegations that amount to "emotionally distancing" a child from a parent, regardless of severity, and even if such actions lead to a child's refusal to visit with a parent, are an insufficient basis on which to sustain a complaint for intentional interference with custody or visitation as that tort has been defined in Maryland.

**TORTS – INTENTIONAL INTERFERENCE WITH PARENTAL RELATIONS – REQUIRED ELEMENTS OF THE COMPLAINT**

Here, the complaint did not allege that a parent had physical removed or harbored a child from the other parent so as to frustrate that parent's visitation or make visitation impossible. Therefore, the circuit court properly dismissed Count I of the complaint.

**TORTS – INTENTIONAL INFLICTION EMOTIONAL DISTRESS**

To sustain a claim for intentional infliction of emotional distress one must allege that: (1) the conduct at issue was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there is causal connection between the extreme and outrageous conduct and the resultant distress; and (4) the emotional distress is severe.

**TORTS – INTENTIONAL INFLICTION EMOTIONAL DISTRESS**

In this case, the appellant's allegations were not "extreme or outrageous," as defined by precedent, nor did the appellant allege "severe" emotional distress. Consequently, the circuit court properly dismissed Count II of the complaint.

Circuit Court for Carroll County
Case No. C-06-CV-19-0126

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1789

September Term, 2019

_____

GREGORY HAINES

v.

GRETCHEN VOGEL

_____

Graeff,
Wells,
Harrell, Glenn T., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Wells, J.

_____

Filed:  April 7, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Appellant, Gregory Haines, filed a complaint against appellee, Gretchen Vogel, his former wife and the mother of their two children, alleging that her conduct toward him amounted to (1) tortious interference with visitation and custody and (2) intentional infliction of emotional distress. The Circuit Court for Carroll County dismissed the complaint with prejudice.

Mr. Haines filed a timely appeal and poses two questions which we have reworded:[1]

1. Did the circuit court properly dismiss appellant's claim for intentional interference with visitation and custody?

2. Did the circuit court properly dismiss appellant's claim for intentional infliction of emotional distress?

For the reasons that we explain below, the circuit court properly dismissed the complaint. We, therefore, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Gregory Haines, (hereafter "Father") and Gretchen Vogel, (hereafter "Mother"), a married couple, had two children, J. born in 2000, and T., born in 2005.[2] The parties

---

[1] Mr. Haines' verbatim questions read:

I. Did the Circuit Court for Carroll County err in dismissing Count I of Appellant's Complaint, Intentional Interference with Visitation and Custody?

II. Did the Circuit Court for Carroll County err in dismissing Count II of Appellant's Complaint and Amended Complaint, Intentional Infliction of Emotional Distress?

[2] For the children's privacy, we shall refer to them by the initial of their first names. Also, we note that by the time Father filed the complaint, J. was an adult.

separated in October 2013 for various reasons including Father's self-admitted "marital misconduct." After the separation, it is undisputed that Mother had de facto physical and legal custody of the children.

Mother filed for divorce in December 2013, and according to Father, he was permitted access with the children, "six and a half hours a week." In February 2014, Mother filed a petition seeking domestic violence protection from Father. Although a court denied the petition, according to Father, the court entered a temporary order allowing him alternating weekend visitation with the children, plus one evening during the week.

We will discuss Father's allegations against Mother in detail later. For now, it is enough to say that for various reasons, the children grew reluctant or outright refused to visit with him. From October 2014 through October 2015, the parties turned to Amy Mazer, LCSW-C,[3] to help them try to repair the relationship between the children and Father. That effort seemed marginally helpful, because the parties retained Dr. Paul Berman, Ph.D., a psychologist, to assess the parties, their children, and make "access and treatment recommendations" aimed at restoring some sort of relationship between the children and Father. Dr. Berman's report, dated July 13, 2016, is included in the joint record extract. About one year later, July 3, 2017, the circuit court appointed Rebecca Snyder, Psy.D., "to serve as the forensic reunification therapist." The outcome of these

---

[3] LCSW-C or Licensed Certified Social Worker-Clinical is the highest level of licensure for a Social Worker. This level allows the license-holder to have a private practice, perform clinical social work, and train LCSW's. *See* Maryland Code Annotated (1981, 2014 repl.), Health Occupations, Title 19; COMAR 10.42.01-10.

interventions are unknown. Based on what happened next, it did not seem that either Dr. Berman's or Dr. Snyder's efforts led to positive results.

On March 20, 2019, Father filed a complaint against Mother alleging in Count I, intentional interference with visitation and custody, and in Count II, intentional infliction of emotional distress. In Count I, Father alleged that Mother's continuing conduct had "deliberately and maliciously" deprived him of his "custodial and/or visitation rights and has alienated the children" from him such that a relationship with them was now "impossible." He demanded damages exceeding $75,000.00. In Count II Father alleged that Mother's conduct had caused him "extreme emotional distress." He demanded damages in excess of $75,000.00.

Mother moved to dismiss. She asserted that the complaint failed to state a cause of action. Specifically, with regard to Count I, she argued that the holdings in *Hixon v. Buchberger*, 306 Md. 72 (1986), *Lapides v. Trabbic*, 134 Md. App. 51 (2000), and *Khalifa v. Shannon*, 404 Md. 107 (2008), require finding that for Father to succeed on a claim of intentional interference of visitation or custody, he must allege that Mother physically removed the children so that it would be impossible for Father to visit with the children. As for Count II, citing primarily, *Batson v. Shifflett*, 325 Md. 684 (1992), Mother claimed that Father's allegations, even if believed, did not amount to the type of outrageous conduct required to sustain an allegation of intentional infliction of emotional distress. Therefore, the circuit court properly dismissed the complaint.

Father maintained that "the lessons" from the holdings of the cited cases, is "that the conduct and the harm must be serious" to successfully prove intentional interference

3

with custody. In Father's estimation the allegations he raised were several orders of magnitude more severe than the conduct in either *Hixon* or *Lapides*. Father argued that Mother's conduct was on par with the conduct under scrutiny in *Khalifa*. There, a mother moved her two minor children to Egypt without telling the children's father. A jury found that the mother had interfered with the father's custody and awarded him substantial money damages. 404 Md. at 113. Father also argued that Mother's continuing efforts to keep the children from him were so outrageous that her conduct met the standard to support his claim for intentional infliction of emotional distress

On June 21, 2019, the circuit court held a hearing on Mother's motion to dismiss. After listening to counsels' arguments, the court dismissed the complaint, but permitted Father to amend within thirty days. He did.

The amended complaint essentially restated Mother's alleged misconduct and added other examples, none of which alleged that Mother had physically removed the children to prevent Father from having contact with them. After a hearing on Mother's renewed motion to dismiss, the court dismissed Father's amended complaint with prejudice. Father subsequently filed this timely appeal. Additional facts are discussed below as necessary.

## DISCUSSION

We review a circuit court's grant of a motion to dismiss without deference. "In determining whether the decision of a lower court was legally correct, we give no deference to the trial court findings and review the decision under a de novo standard of review." *Lamson v. Montgomery Cnty.*, 460 Md. 349, 360 2018 (quoting *Walter v. Gunter*, 367 Md. 386, 392 (2002); *Howard v. Crumlin*, 239 Md. App. 515, 521 (2018) ("[T]he standard of

4

review of the grant or denial of a motion to dismiss is whether the trial court was legally correct."

## I. Intentional Interference with Visitation and Custody

Both parties rely for support on the previously cited cases of *Hixon*, *Lapides*, and *Khalifa*. We examine each case separately.

### 1. *Hixon v. Buchberger*

Jonathan Hixon and Linda Liebelt had a child during their relationship. A court order granted Liebelt residential custody of the child and granted Hixon specified visitation. 306 Md. at 73-74. Liebelt began living with and later married Paul Buchberger. Hixon sued Buchberger, claiming,

> [t]hat on November 16, 1984, at a time when [Hixon] lawfully went to [Liebelt's and Buchberger's] address to pick up the minor child for visitation purposes, the Defendant Buchberger began making belligerent and hostile statements to [Hixon] in the presence of the minor child, stating that [Hixon] was not really the child's father. The said Defendant Buchberger made it difficult for the Plaintiff, Jonathan D. Hixon, to physically take his child with him to exercise normal visitation, at times the Defendant flatly refused to surrender the child to [Hixon] and repeatedly threatened violence.

*Id*. at 74. The circuit court dismissed Hixon's claim of tortious interference with visitation and Hixon appealed to this Court.[4] *Id*. at 75. Before we could consider the appeal, the Court of Appeals granted certiorari.

---

[4] As was the case here, Hixon's complaint consisted of two counts. The first count sought an injunction. The second count claimed intentional interference with visitation and demanded compensatory and punitive damages totaling $85,000.00. *Hixon*, 306 Md. at 75.

In evaluating the circuit court's dismissal of Hixon's complaint, the Court reviewed decisions from the turn of the last century, observing that those cases dealt with tortious interference with domestic relations known as enticement or abduction of a child. *Id*. However, the Court determined that the Restatement (Second) of Torts (1977) ("Restatement"), section 700 was more applicable. That section states:

> [o]ne who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.

*Hixon*, 306 Md. at 78. The Court concluded that comment *g* of the Restatement section 700 permitted,

> a custodial parent who suffers the tort [to] recover damages for the loss of society of the child, for emotional distress resulting from abduction or enticement, for loss of service, and for the reasonable expenses of regaining the child and in treating any harm suffered by the child as a result of the tortious conduct.

*Id*.

Hixon acknowledged this lineage of cases but urged the Court to instead rely on the holding in *Ruffalo v. United States*, 590 F. Supp. 706 (W.D.Mo.1984), arguing that the cause of action should not be limited to the custodial parent. *Id*. at 79. In *Ruffalo*, the United States Court for the Western District of Missouri granted a mother a money judgment after she successfully sued for tortious interference of custody. There, the mother had legal custody of the parties' minor son. The father and the child entered the Federal Witness Protection Program and were given new identities. *Ruffalo*, 590 F. Supp. at 709. The federal court found that the father's and son's entry into the Witness Protection

6

Program "had the effect of destroying [the mother's] pre-existing legal right." The court found that "[i]ntentional interference with visitation rights may therefore be imputed to the governmental sponsor of the Witness Protection Program." *Id.* The court suggested that "state courts could well restrict this type of claim to situations that are not insubstantial in duration and effect" but, "the possibility of truly petty damage suits does not argue persuasively against recognition of a right to sue." *Id.* at 713. The court then made "an educated guess," that Missouri would recognize a damage suit for interference with visitation rights and assessed damages to the mother for the deprivation of those rights. *Id.*

After examining *Ruffalo* and appellate precedent from other jurisdictions, the Court of Appeals declined to expressly rule on Mr. Hixon's contention that "Maryland law should not limit monetary recoveries in cases of intentional interference with parent/child relations to interferences with custody." *Hixon*, 306 Md. at 78. Instead, the Court stated that "a proper recognition of the interests of a parent who is awarded visitation rights includes recognition of a cause of action for damages for intentional interference with visitation rights." *Id.* at 79.

Significantly, the Court concluded that "the interference alleged here falls short, by a considerable distance, of the more substantial interferences presented in many of the cases relied upon by Hixon." *Id.* The Court concluded that the "belligerent words" that Buchberger used were "so minor" that that they did not amount to an interference with Hixon's visitation rights. *Id.*

Indeed, the Court rejected *Ruffalo*'s reasoning which suggested that the bringing of a tortious interference of custody suit might deter illegal conduct. *Id.* at 83. The Court

7

concluded that damage suits are an undesirable remedy for a relatively minor interference with visitation rights.

> **Overarching all of the contentions in disputes concerning custody or visitation is the best interest of the child.** But **a damage action for interference with the transfer of a child from custody to a visitation, or vice versa, based on words spoken, even if they are objectively hostile and belligerent, would not seem to be generally in the best interest of the child** involved. Inevitably the defense in such cases will be that the claimed interference by speaking was really an effort to protect the child from some detriment. **Such issues should be resolved by the chancellor as an adjunct to jurisdiction over the child and not by a jury in the context of awarding or withholding damages between litigating adults**.

*Id.* at 83-84 (emphasis supplied).  The Court concluded by stating that Hixon had "a variety of equitable remedies" available to him without adding "an additional weapon" to "the arsenals of divorced or separated parents."  *Id.*

## 2. *Lapides v. Trabbic*

Jeffrey Lapides had joint residential custody of his three children with Kathy Gabriel.  Lapides sued Gabriel's domestic partner, Kristen Trabbic, alleging that she interfered in his relationship with his teenage daughter, Jessica, who was living with Gabriel and Trabbic.  134 Md. App. at 54.  Lapides alleged that Trabbic's interference,

> included refusing and denying him the opportunity to speak with Jessica on the telephone; interfering with his telephone calls to Jessica; making deliberate plans to interrupt his time spent with Jessica; instructing Jessica to not speak to him; directing Jessica to disregard his authority; and advising Jessica that he was not the parent responsible for disciplining her.

*Id*. at 54-55. Among the four counts in Lapides' complaint, was one for "[i]ntentional interference with parent/child relations."[5] *Id*. at 54. After a hearing, the circuit court granted Trabbic's motion to dismiss and Lapides appealed to this Court. *Id*. at 55.

We began our analysis of Lapides' claims by reviewing the Court of Appeals' analysis in *Hixon*. Although not cited by the Court of Appeals in *Hixon*, nor in either of the briefs submitted in *Lapides*, we determined that Restatement section 699 was "critical" to fully understanding Restatement section 700, previously quoted. Restatement section 699 states:

> One who, without more, alienates from its parent the affections of a child, whether a minor or of full age, is not liable to the child's parent.

Viewing both sections together, "we [saw] that under the Restatement view, an actionable tort must be predicated on proof of acts other than the mere persuasion of a child to transfer its affection from its parent." *Lapides*, 134 Md. App. at 59.

We concluded that Lapides' allegations revealed that Trabbic's conduct was "mere persuasion." Nevertheless, Lapides implored us to see that Trabbic's actions were more serious and formed "a pattern of continuing intentional disruptive conduct." *Id*. Still, Lapides did not assert that Trabbic "induce[d] or encourage[d] Jessica to live with her mother, rather than appellant." *Id*. We acknowledged that Lapides' allegations were serious and could properly be the subject of a contempt action or a petition for modification

---

[5] The other counts alleged negligence, enticement, and fraud. *Lapides*, 134 Md. App. at 54.

9

of custody.  However, we held that Lapides' allegations did not "transform a family law issue into a tort claim under either existing Maryland law or precedent in other states." *Id*.

In reaching this conclusion, we examined cases from other jurisdictions, including *Murphy v. I.S.K. Con. of New England, Inc*., 571 N.E.2d 340, *cert. denied*, 502 U.S. 865, (1991), where the Massachusetts court observed that the

> **tortious conduct referred to [in previous Massachusetts cases] includes the abduction, enticement, and harboring and secreting of minor children from their parents, or in other words, the intentional interference with parental interests or rights**. The elements of these causes of action are well established. Abduction is the physical taking of a minor child from the parent having legal custody. An action for enticement will lie where one, through an 'active and wrongful effort' and knowing that the parent does not consent, induces a child to leave the parent's home. One 'harbors' a minor child by inducing or encouraging a child, who is away from the parent without the parent's consent, to remain away from the parent[.]

*Id*. at 351 (emphasis supplied) (citations omitted).  And, *Stone v. Wall*, 734 So.2d 1038 (Fla.1999), where the Florida Supreme Court relying, in part, on the analysis in *Murphy*, recognized the cause of action for interference with parent/child relations when a grandparent and others intentionally abducted the child.  *Id*. at 1046.

Based on these cases, we held that "physical removal of the child from the custodial parent would be essential to such action." *Lapides*, 134 Md. App. at 63.  Specifically, we held that the heightened "potential for injury resulting from physical removal may warrant the imposition of tort damages." *Id*.  However, any lesser interference with a parent's custodial rights would be outweighed in balancing the merits of the tort action as a deterrent to interference, and the great potential for injury to children that will result from such additional litigation.  *Id*.  We concluded that this would be the result even if Lapides'

10

allegation was that Trabbic "induced and compelled Jessica not to reside with appellant," because the parents had agreed that Jessica could choose which parent she wished to live with on a weekly basis. *Id*. at 64-65.

3. *Khalifa v. Shannon*

Michael Shannon sued his ex-wife, Nermeen Khalifa Shannon, and her mother, Afaf Nassar Khalifa, in the Circuit Court for Anne Arundel County for intentional interference with custody and visitation after the mother and grandmother took the couple's two minor sons to Egypt to live, without his knowledge. 404 Md. 112. The mother and grandmother moved to dismiss the father's complaint, arguing, among other things, that intentional interference with custody and visitation was not recognized in Maryland. *Id*. at 113. The circuit court declined to dismiss, and the matter proceeded to a jury trial. The jury returned a verdict exceeding $3 million in compensatory and punitive damages. *Id*. The mother and grandmother appealed to this Court. Before we could consider the appeal, the Court of Appeals issued a writ of certiorari. *Id*. at 114.

The Court of Appeals saw its task as determining "whether the tort of interference with custody and visitation rights exists, and whether a parent, who has both legal custody and visitation rights under court order at the time of the abduction and harboring of minor children, has to plead and prove that he or she has suffered an economic loss as a result of the abduction and harboring." *Id*. at 115. The Court began its analysis with a review of the abduction and harboring children cases from the early twentieth century in Maryland and other jurisdictions. Those cases, exemplified by *Baumgartner v. Eigenbrot*, 100 Md. 508 (1905), recognized a tort cause of action resulting from the harboring or the abduction

11

a child from a parent or anyone having custody. "Abduction is the unlawful taking or detention by force, fraud, or persuasion of a person…a child or a ward, from the possession, custody, or control of the person legally entitled thereto." *Khalifa*, 404 Md. 116 (quoting *Baumgartner*, 100 Md. at 513). The Court acknowledged that cases like *Baumgartner* and those from other jurisdictions, such as *Murphy*, which the Court also cited, were precursors to its decision in *Hixon*.

The Court recognized that *Hixon* offered it the first occasion in which to determine whether abduction and harboring could be the basis of a cause of action for interference with parent-child relations. *Khalifa*, 404 Md. at 124. Focusing on Judge Rodowsky's reasoning in *Hixon*, the Court determined that the allegations there were insufficient to sustain a tort cause of action for assault, battery, or intentional infliction of emotional distress. In short, the conduct there did not describe conduct that was "outrageous" and "so extreme, as to go beyond all possible bounds of decency." *Khalifa*, 404 Md. at 124 (quoting *Hixon*, 306 Md.at 77) (internal citation omitted). The Court observed that *Hixon* underscored that the Court's "decisions involving interference with the relationship between parent and child…recognized that abduction and enticement were the precursor causes of action for interference with parent-child relations." *Khalifa*, 404 Md. 125 (quoting *Hixon*, 306 Md. at 77) (emphasis suppled). The Court concluded its analysis stating that with *Hixon* the Court of Appeals "not only recognized that the tort of interference with parent-child relations was extant, but also defined the elements and applied them to the factual allegations." *Khalifa*, 404 Md. at 127. Consequently, the Court held that the father's complaint was sufficient to survive a motion to dismiss, because he

12

alleged that the mother and grandmother deliberately and intentionally deceived him into thinking that they were taking the children on a trip to New York City "to visit relatives," when in fact they "did abduct the boys and harbor them in Egypt." 404 Md. at 127.

The Court went on to determine three additional issues. *First*, that the father need not have plead loss of services to sustain an allegation of intentional interference in parent-child relations. *Id*. at 138-39. *Second*, that the complaint had alleged a "substantial" interference in the father's visitation rights. *Id*. at 141. And, *third*, that the gravity of the mother's actions justified the deterrent value of the punitive damages award. *Id*. at 148-49.[6]

### 4. The Amended Complaint

In the first count of the amended complaint, alleging intentional interference with visitation and custody, Father's prime allegation is that Mother made "deliberate efforts to

---

[6] In a concurring opinion, Judge Raker, who happened to be the trial judge in *Hixon*, took issue with *Khalifa*'s reading of that case. Judge Raker opined that *Hixon* **did not** recognize a tort cause of action for interference with parent-child relations. *Khalifa*, 404 Md. at 149. To make her point, Judge Raker quoted the following passage from *Hixon*:

> We need not decide in this case whether, or, if so, under what circumstances a damage action might lie for interference with visitation rights. We hold simply that a parent or that parent's ally who, without committing any tort presently recognized in Maryland, speaks hostilely to the other parent about that parent's exercise of custody or visitation rights does not thereby become liable in damages.

*Khalifa*, 404 Md. at 150 (quoting *Hixon*, 306 Md. at 72). Judge Raker concluded by saying that if the Court chose to recognize a new cause of action, which it had the authority to do, it should do so clearly, and explain its rationale. Otherwise policy decisions with such "potentially far-reaching social and legal consequences" should be left to the General Assembly to consider. *Khalifa*, 404 Md. at 150.

alienate the children from [him]." Specifically, he states that Mother made inappropriate comments about him in front of the children. He then cites several examples of comments that Mother allegedly made.

Aside from comments Mother allegedly made, Father also alleged that (1) Mother gave each of the children a cell phone, so, Father claims, she could communicate with them during his visitation and thereby deny him "meaningful visits;" (2) Mother once "sped off," leaving T. (then aged 9) at a Maryland State Police Barracks after T. allegedly "took too long to hug and say goodbye," during a visitation exchange; (3) Mother encouraged the children not to return Father's phone calls; (4) Father made a comment to his therapist, which he claims was merely a metaphorical allusion to his frustration with Mother.[7] Apparently though, the therapist was concerned enough about Father's comment that the therapist reported it "to various people, including Mother." Afterward, Father alleged that Mother told the children what Father had said, "with the sole intent of worsening [his] relationship with them;" (5) Father complains about the length of visitation at a community center. And as a result, over time, the children grew so angry with him that they refused to see him. According to the amended complaint, Mother did nothing to encourage the children to see Father; (6) Father quotes several passages from Dr. Berman's written report which describe the children's hostility toward Father. Father alleges the children's warped view of him was caused by Mother's behavior.

---

[7] Father admits that he said something along the lines of, "Sometimes I get so frustrated I could strangle her."

14

## 5. Parties' Contentions

Father's argument begins with this question: "[W]hat is the difference between inducing a minor child not to return to a parent in conformity with a court order and alienating a child's affection from that parent?" He continues, starkly arguing that if this Court concludes that Mother's actions fall under the Restatement section 700, he "wins this appeal." On the other hand, Father argues, if this Court concludes that Mother's actions fall under Restatement 699, alienation of affection, "he loses this appeal."

Mother argues that the circuit court properly determined that the allegations that Father raises amount to alienation of affection. Mother asserts that to state a claim for intentional interference with custody or visitation, the complaint must allege "some sort of physical abduction or harboring or enticement."

## 6. Analysis

*Hixon* and *Khalifa*'s comprehensive review of cases that have addressed tort suits alleging interference with domestic relations from the beginning of the last century until now, show that this specific tort was grounded in two other torts: abduction and enticement. Significantly, in *Khalifa*, the Court of Appeals accepted that appellate authority from other jurisdictions, as well as the limited jurisprudence from the Court of Appeals' "decisions involving interference with the relationship between parent and child…*recognized that abduction and enticement were the precursor causes of action for interference with parent-child relations*." *Khalifa*, 404 Md. at 125 (quoting *Hixon*, 306 Md. at 77) (emphasis supplied). On this point, *Khalifa* and *Lapides* both favorably cite the rationale of the Supreme Judicial Court of Massachusetts which, in *Murphy*, stated:

15

Implicit in each action [of tortious interference with the parent-child relationship] is the requirement that the child be physically absent from the home for a continuous period of time. To allow recovery for interference with parental interests without physical absence of the minor child from the home would be to allow an action for alienation of affections, for which recovery cannot be had.

*Murphy*, 571 N.E.2d at 351; *see Khalifa*, 404 Md. at 122-23.

In *Lapides*, we categorically stated that "[w]ere Maryland to recognize an action for tortious interference with parent/child relations, we think that physical removal of the child from the custodial parent would be essential to such action." 134 Md. App. at 63-64. At the same time, this Court in *Lapides*, 134 Md. App. at 58-59, and to a lesser degree the Court of Appeals in *Khalifa*, 404 Md. at 127 n.8, recognized that Restatement 699, alienation of affection, cannot form the basis of a tort claim. Finally, each of the Maryland appellate decisions now examined have held that the alleged interference must be "outrageous" and "extreme." *Khalifa*, 404 Md. at 124; *Hixon*, 306 Md. at 77; *Lapides*, 134 Md. App. at 63-64.

Consequently, we take from the holdings in *Hixon*, *Lapides*, and *Khalifa*, and the other authorities cited, that the basis of a tort claim for interference with custody and visitation, is that the conduct must be: (1) intentional, (2) outrageous, and (3) involve the physical removal and harboring of the child from the parent. With regard to the last point, the tort is based on cases of abduction. Indeed, *Khalifa* and *Lapides* make clear that physical removal must be alleged and proven to sustain a charge of interference with a parental relationship as defined in the Restatement, section 700. Further, while the level of outrageousness is not defined, we have for guidance the conduct of the mother in

16

*Khalifa*, as an example of what the Court of Appeals has determined is "outrageous" and "extreme." There, the mother intentionally deceived the father about where she was taking the children, and with her mother's help, took the minor children to another country. Consequently, the requisite outrageous conduct cannot be merely words or acts that cause estrangement but conduct that results in the physical removal of the child from a parent.

Based on this analysis, Father falls short of alleging that Mother's conduct, though perhaps vexing and hurtful to him, constitutes intentional interference with the parent-child relationship as we have concluded it is defined in Maryland. While Father has alleged that Mother's conduct was intentional, he has not alleged conduct that was outrageous. To be sure, Mother's alleged actions, if proven, could be said to have contributed to the children's estrangement from Father. We cannot say, however, that Mother's behaviors constituted conduct that was objectively "outrageous," "extreme," or "beyond the pale."

More importantly, Father does not allege that Mother attempted to physically remove the children from Father, as did the mother in *Khalifa*. Here, Father alleges that Mother, by allegedly badmouthing him and doing other things, has distanced the children emotionally from him. *Khalifa*'s holding, and the reasoning presented in *Lapides* and *Hixon*, show that an allegation of intentional interference with custody or visitation must allege the spatial movement of a child away from a parent.

Father seems to argue that if Mother's conduct is deemed outrageous enough, then that would be sufficient to sustain his claim for intentional interference with custody. We disagree. Under the precedent cited, the type of inducement required is to facilitate the physical removal of the child, not the psychological or emotional distancing of the child

17

from a parent, no matter how bad the conduct. *Khalifa* and *Lapides* make abundantly clear that physical removal is what is required. Father does not make this allegation. The behaviors that Father alleges reflect his belief that Mother's intentional conduct alone has alienated him from the children's affections. Under Restatement section 699, this cannot form the basis of an actionable tort claim.[8] We conclude that the appellate authority we have examined makes abundantly clear that before a trial court will permit an intentional interference of custody case to go forward, the conduct alleged must be intentional, beyond the pale, and result in the physical removal of a child before the case may proceed. As that was not done here, the circuit court properly dismissed Count I of the complaint.

Mother's behaviors, if proven, may appropriately form the basis of a civil contempt petition or a motion to modify custody or visitation. It is conceivable that the court could modify custody or visitation, provided that Father proves a material change in circumstances and that the proposed modification is in the child's best interests. *See Wagner v. Wagner*, 109 Md. App. 1, 28, *cert. denied*, 343 Md. 334 (1996) Separately, Mother's actions may amount to a willful disregard of the court's visitation order. *See generally Kowalczyk v. Bresler*, 231 Md. App. 203 (2016). Importantly, both actions would allow the court, rather than a jury, to resolve what will undoubtedly be conflicting and emotion-laden testimony. Either remedy would allow the court to make what, based on the record, could well be a complex assessment of the dynamics between the minor child and his parents. In this way the circuit court would preserve its role "as both a

---

[8] Father recognizes that the amended complaint concerned only T., as he was a minor at the time that the amended complaint was filed.

18

protector of the child and as the resolver of a dispute between the parents." *McMahon v. Piazze*, 162 Md. App. 588, 594 (2006). The court would be best positioned to resolve the central issue at the heart of this controversy: whether the court should use its equitable powers to address Mother's alleged behaviors. Either petition would be a more prudent course than allowing one parent to sue the other for money damages to resolve these important issues.

**II**. **The Court Properly Dismissed Count II for Failure to State a Claim of IIED**

Father argues that Mother's previously described conduct forms the basis of a claim for intentional infliction of emotional distress (hereafter, "IIED"). Mother maintains that Father's allegations do not meet the test for "outrageousness" required by Maryland appellate precedent, nor does Father claim that Mother's conduct has caused him severe emotional distress. We agree with Mother and explain.

The Restatement of Torts, Chapter 2, Emotional Distress, section 46, specifies that for a plaintiff to recover for IIED they must prove that:

> (1) The conduct at issue was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there is causal connection between the extreme and outrageous conduct and the resultant distress; and (4) the emotional distress is severe.

Restatement § 46. *See also Harris v. Jones,* 281 Md. 560, 566 (1977). In *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653 (1991), the Court of Appeals cautioned that liability for the tort of IIED should be imposed sparingly and "'its balm reserved for those wounds that are truly severe and incapable of healing themselves.'" (quoting *Hamilton v. Ford Motor Credit Co.,* 66 Md. App. 46, 61, *cert. denied,* 306 Md. 118 (1986)). Consequently, Father

bears the burden of proving that Mother's conduct meets the four elements to sustain a claim for IIED. We now examine each element.

a. The conduct must be intentional or reckless

IIED occurs when the actor "desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct; or where the defendant acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow." *Harris*, 281 Md. at 567. We have reviewed Father's allegations as outlined in the previous section of this opinion. We think that Father's allegations show that Mother's conduct, at least in some instances, may have been intentional or reckless. For example, Father alleges that Mother sped away from a visitation exchange, allegedly because T. took too long saying farewell to Father, thus leaving the minor in the parking lot of a Maryland State Police Barracks with Father. Father cites this as an example of Mother's disapproval of the children showing displays of affection toward Father.

b. The conduct must be outrageous

To sustain an allegation of IIED the alleged conduct must be both extreme and outrageous. *Batson v. Shiflett*, 325 Md. 684, 734 (1992) ("For conduct to meet the test of 'outrageousness,' it must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"). In making this determination, a court must consider not only the conduct itself but also the "personality of the individual to whom the misconduct is directed." *Id*. This high standard of culpability exists to screen out claims amounting to "mere insults,

20

indignities, threats, annoyances, petty oppressions, or other trivialities" that simply must be endured as part of life. *Id.* Further, the alleged conduct must "go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community." *Lasater v. Guttmann*, 194 Md. App. 431, 448 (2010). Restatement § 46, cmt. d. "Whether the conduct complained of meets this test is, in the first instance, for the court to determine[.]" *Baston*, 325 Md. at 734.

A claim for IIED has been sustained in Maryland four times. And, indeed, the tort has been found to exist in only the most extreme circumstances. *See Faya v. Almaraz*, 329 Md. 435 (1993) (reversing dismissal when HIV-positive[9] surgeon operated on the appellants without their knowledge of his disease); *Figueiredo-Torres*, *supra* (reversing dismissal when plaintiff alleged psychologist engaged in sexual relations with plaintiff's wife during the time he was counseling the couple); *B.N. v. K.K.*, 312 Md. 135 (1988) (sustaining cause of action for IIED when a physician with herpes had sex with nurse without informing her that he had the disease and infected her); *Young v. Hartford Accident & Indem. Co.*, 303 Md. 182 (1985) (reversing dismissal when workers' compensation insurer insisted that claimant submit to psychiatric evaluation for the "sole purpose" of harassing her and forcing her to drop her claim or commit suicide).

We discern from these cases that the accused had a unique relationship with the person claiming emotional distress. For example, in *Figueiredo-Torres*, a psychologist

---

[9] Acquired immunodeficiency syndrome (AIDS) is a chronic, potentially life-threatening condition caused by the human immunodeficiency virus (HIV). By damaging the immune system, HIV interferes with the body's ability to fight infection and disease. Diseases-HIV, *Mayo Clinic*, https://mayocl.in/2M2kGsU.

who engaged in sexual relations with the plaintiff's wife while giving the couple marriage counseling was found liable for IIED. 321 Md. at 653. The Court of Appeals held that the psychologist was in a unique position to influence the patient's emotional well-being and took advantage of that position, knowing the emotional impact on the husband would have been great if he discovered that his counsellor was having an affair with his wife. *Id.*

Here, the relationship is that of estranged former spouses, both being the parents of one minor child, T. We are unwilling to say that simply because Mother has residential custody of T., that presents the type of unique relationship exhibited in the cited cases. To be sure, we understand that a power dynamic may very well be at play here. We note that although Father alleges that Mother has turned T. and his adult sister, J., against him, he does not specifically allege that Mother's status as custodial parent is the source of the emotional harm. In other words, Mother's conduct is Father's focus, not her status. Nonetheless, we recognize that a parent's status as the custodial parent may affect the non-custodial parent's relationship with a child and may be a factor constituting outrageous conduct. *Harris,* 281 Md. at 569 ("the extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests") (citing Restatement § 46 comment e (1965)).

We now consider whether Mother's alleged conduct "exceeded all bounds of decency." *Lasater*, 194 Md. App. at 448. Mother's alleged behaviors, if believed, were not on the scale of the acts described in *Faya*, *Figueiredo-Torres*, *Batson, or Harris*. Clearly, Father is concerned about his relationship with both of his children and what he

22

believes to be Mother's concerted efforts to deny him a meaningful relationship with his children. We are mindful of the potentially corrosive effects that one parent's behaviors might have on a child's perception of the other parent. Further, we agree that there may be evidence to back up Father's claims, such as some of the comments from Dr. Berman that Father quoted in his complaint and mentioned at oral argument. But this Court concludes that Mother's behavior is not of the type of conduct that has previously sustained a finding of IIED. To sustain an allegation of IIED, the conduct must rise to the level of being "intolerable" and "outrageous." Mother's alleged conduct, while perhaps vexing and inappropriate, cannot be said to be extreme or outrageous, as has been defined. *See, e.g., Young v. Hartford Accident & Idem. Co.*, 303 Md. 182 (1985).

      c. The severity of emotional distress

Finally, Father must allege that the emotional distress that he experienced was so severe that "no reasonable person could be expected to endure it." *Leese v. Balt. Cnty.*, 64 Md. App. 442, 471 (1985); *Harris*, 281 Md. at 570-71. One must be unable to function or "to tend to necessary matters." *Leese*, 64 Md. App. at 472; *Vance*, 41 Md. App. 135 (1979).

In the amended complaint, Father does not claim that he cannot function or carry on with "necessary matters." To be sure, he alleges that his relationship with his children has suffered severely but he does not allege that Mother's actions have taken such an emotional toll that he cannot carry on or endure. *See Harris*, 281 Md. at 571. Again, we understand Father's concern with this situation. But as noted, claims of IIED are reserved for the most serious and emotionally devastating acts. *Batson*, 325 Md. at 734; *see Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 670 (1992) ("[T]he tort is to be used

23

sparingly and only for opprobrious conduct that includes truly outrageous conduct."). This is an appropriate limitation on application of the tort, so that it is limited to truly outrageous conduct and will not form a basis for a tort claim that might arise in the context of a custody dispute, where equitable remedies such as contempt and modification are available to an aggrieved parent.

Finally, absent an allegation of truly outrageous conduct, we leave for future consideration the causal connection between the alleged outrageous conduct and the alleged emotional distress. Since Father does not allege the requisite conduct nor a severe enough injury here, we do not think it necessary to discuss the required causal link.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**